UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

HPC US FUND 1, L.P., a New York
limited partnership, and HPC US FUND 2, L P.,
a New York limited partnership

       Plaintiffs,

v.

DALE WOOD, an individual,
THE WHYDAH GROUP, INC., a Florida profit corporation,
WELLESLEY ASSET SECURED PORTFOLIO, INC.
a Florida profit corporation, PETER BURGESS, an individual,
ROLAND BRETON, an individual,
DE LOS REYES PROPERTIES, LLC, a Florida limited liability
company, ATLANTIC CITY PROPERTIES, LLC, a Florida limited
liability company, TRIBECA 56 WALKER, LLC, a Florida limited
liability company, GABRIEL DE LOS REYES, an individual,
RITE TIMING SERVICES CORP., a Florida profit corporation,
TIM SUAZO, an individual, THOMAS MAYER, an individual,
and THE PAN AMERICAN FUND, LLC, a Florida limited
liability company.

       Defendants

_____/

## COMPLAINT

Plaintiffs, HPC US FUND 1, L.P. (hereinafter "HPC US 1"), a New York limited

partnership, and HPC US FUND 2, L.P. (hereinafter "HPC US 2"), a New York limited

partnership, by and through their undersigned counsel, hereby file this Complaint against the

Defendants, DALE WOOD (hereinafter referred to as "WOOD"), individually, THE WHYDAH

GROUP, INC. (hereinafter "WHYDAH"), a Florida profit corporation; WELLESLEY ASSET

SECURED PORTFOLIO, INC. (hereinafter "WELLESLEY"), a Florida profit corporation,

PETER BURGESS (hereinafter "BURGESS"), individually, ROLAND BRETON (hereinafter

"BRETON"), individually; DE LOS REYES PROPERTIES, LLC (hereinafter "DE LOS REYES PROPERTIES"), a Florida limited liability company; ATLANTIC CITY PROPERTIES, LLC (hereinafter "ATLANTIC CITY PROPERTIES"), a Florida limited liability company; TRIBECA 56 WALKER, LLC (hereinafter "TRIBECA"), a Florida limited liability company; GABRIEL DE LOS REYES (hereinafter "DE LOS REYES"), an individual, RITE TIMING SERVICES CORP. (hereinafter "RITE TIMING"), a Florida profit corporation, TIM SUAZO (hereinafter "SUAZO"), an individual; THOMAS MAYER (hereinafter "MAYER"), an individual, and THE PAN AMERICAN FUND, LLC (hereinafter "PAN AMERICAN"), and state as follows:

## PRELIMINARY STATEMENT

1.      This is an action for damages and equitable relief arising from the unauthorized transfer of Plaintiffs real estate and mortgage interests by WOOD to certain other Defendants and third parties, and the fraudulent concealment of those transfers from Plaintiffs.

2.      The Plaintiffs are investment companies which exist for the purpose of investing in the United States real estate and mortgage market. The Plaintiffs represent the interests of 1,872 German nationals who have pooled $56,499,000.00 with the Plaintiffs for such investment purposes.

3.      Defendants are several individuals and entities many of which have acted in concert to defraud Plaintiffs.

4.      Specifically, WOOD misrepresented to Plaintiffs that the real estate and mortgage interests actually held by Plaintiffs remained in Plaintiffs ownership or control, while simultaneously conveying, transferring, and/or assigning Plaintiffs' interests to other Defendants

and third parties without providing to or accounting for the proceeds to Plaintiffs and often in exchange for less than reasonably equivalent value.

## JURISDICTION AND VENUE

5.　The amount in controversy is in excess of $75,000.00, exclusive of attorney's fees and costs

6.　Jurisdiction is proper pursuant to 28 U.S.C. § 1332, diversity of citizenship, and 18 U.S.C. § 1964.

7.　HPC US 1 is a limited partnership organized and authorized to do business under the laws of the State of New York.

8　HPC US 2 is a limited partnership organized and authorized to do business under the laws of the State of New York.

9.　HPC US 1 and HPC US 2 do not have a principal place of business in Florida.  As of the date this action was filed, their principal place of business was in Germany, where their principals and management reside, coordinate corporate and business activities in the ordinary course, and coordinate litigation efforts pertaining to this lawsuit.

10.　WOOD is an individual domiciled in Broward County, Florida.

11.　WHYDAH is a corporation organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Fort Lauderdale, Broward County, Florida.

12.　WELLESLEY is a corporation organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Fort Lauderdale, Broward County, Florida

13.     According to state records, BURGESS is an individual domiciled in Broward County, Florida

14.     According to state records, BRETON is an individual domiciled in Broward County, Florida

15.     DE LOS REYES PROPERTIES is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida

16.     ATLANTIC CITY PROPERTIES is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida

17.     TRIBECA is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

18     According to state records, DE LOS REYES is domiciled in Miami-Dade County, Florida.

19.     RITE TIMING is a corporation organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

20.     According to state records, SUAZO is domiciled in Miami-Dade County, Florida.

21.     According to state records, MAYER is domiciled in Broward County, Florida.

22     PAN AMERICAN is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Broward County, Florida.

23      Venue is proper pursuant to 18 U S.C. § 1965 and 28 U.S C. § 1391(b)(1) and (2) as a substantial part of the events took place in Broward County, Florida, at least one of the Defendants resides in Broward County, and all of the Defendants are domiciled or have their principle place of business in the Southern District of Florida.

24.     Plaintiffs have retained the law firm of Tripp Scott, P A  in this matter, and are obligated to pay the firm a reasonable attorneys' fee for its services  Plaintiffs seek reimbursement of its legal fees pursuant to 18 U S.C. § 1964 and Fla  Stat  § 772.104.

25.     All conditions precedent to the filing of this action have been performed, satisfied, or waived

## GENERAL ALLEGATIONS

26.     Dale Wood ("WOOD") was the manager of Blackport Investment Group, LLC ("Blackport"), HPC Loan Servicer, LLC, and certain other special purpose vehicles related to the management of Plaintiffs real estate and mortgage portfolios. Specifically, WOOD was in charge of performing the actual management services for Plaintiffs' property interests.

27.     WOOD currently holds a 49% membership interest in Blackport

28.     Prior to the end of 2012, the ownership of Blackport was as follows: 33.34% by Michael Pirgmann; 33.33% by Andre Hoffmann; and 33.33% by WOOD.

29      WOOD, *apparently* discharging his duties, provided periodic status reports and annual statements to the Plaintiffs, which purported to account for their respective portfolios.

30.      On or about August 1, 2013 a financial irregularity regarding repayment of $500,000 00 that had been provided to WOOD by Michael Pirgmann, 51% member of Blackport and advisor to Plaintiffs, was discovered.

31    Mr. Pirgmann provided the funds because WOOD told Mr. Pirgmann that WOOD needed the funds as flash capital liquidity for the potential acquisition of a new asset unrelated to Plaintiffs.

32.    When WOOD did not timely repay the funds to Mr. Pirgmann, the Plaintiffs were prompted to generally investigate WOOD's management of the Plaintiffs' affairs.

33.    Upon investigation, Plaintiffs discovered that the status reports and annual statements provided by WOOD were false

34.    WOOD's representations to Blackport itself, and the Plaintiffs, regarding his conduct and the true status of the property interests, were false.

35    WOOD's status reports and annual statements misrepresented that certain assets were still held by Plaintiffs.

36    In actuality, as detailed further below, WOOD fraudulently concealed that he had sold certain assets for less than reasonably equivalent value to other Defendants and sold other assets to third parties without authorization from or the knowledge of Plaintiffs; fraudulently conveyed, assigned, transferred, and liquidated assets; and fraudulently concealed the proceeds from his activities

37    In so doing, WOOD often signed instruments that would transfer Plaintiffs properties or mortgage interests improperly. WOOD never held a position directly in HPC Management, LLC; HPC Fund Management, LLC; HPC US 1; or HPC US 2. Thus, any instruments signed by WOOD as a manager, officer, director, or partner in any one of those entities is fraudulent

38    Under the current operating agreement, WOOD was the manager of Blackport from the agreement's effective date, January 2010, until his removal on or about August 7, 2013.

He was removed immediately after the Plaintiffs discovered some of the fraudulent conduct described herein.

39.    WOOD's status as manager of Blackport did not give him the authority to convey any property interest managed by the company on behalf of HPC US 2 or HPC US 1 worth over $50,000 00 without the written consent of the majority of the equity owners of Blackport.

40.    Thus, WOOD would have needed the written consent of Mr. Pirgmann, the 51% ownership interest, and for conveyances prior to the end of 2012 the written consent of either Mr. Pirgmann or Mr. Hoffmann

41.    WOOD did not have the consent of the majority of the equity owners of Blackport or the consent of any entity capable of binding the Plaintiffs to transfer any of the property interests described herein

42    WOOD's ownership interest in Blackport does not give him the authority to convey the properties at issue without the consent of another member

43    Thus far, Plaintiffs have discovered that none of the below described activity has been accounted for to the Plaintiffs, nor did Plaintiffs authorize the transfers

44.    Several of the properties in which Plaintiffs have interests are subject to a receivership. Wextrust Capital, LLC, a company with which HPC US 1 had entered into a joint venture, has had a receiver appointed over it in a case currently pending in the Southern District of New York· *SEC v Byers*, Case No.: 08-cv-7104. Herein, that case will be referred to as the "Wextrust Receivership."

45.    After Plaintiffs began investigating WOOD's acts as the manager of Blackport and HPC Loan Servicer, LLC, Plaintiffs' representative contacted the Wextrust Receiver on August 1, 2013.

46.     The Receiver disclosed that several bank accounts held by the Plaintiffs, and their related entity, HPC Management, LLC, have been frozen. According to the Receiver, the balance of those accounts is de minimis or at zero balance

47.     Plaintiffs do not know of any additional bank accounts held by Plaintiffs or their related entity, HPC Management, LLC, into which WOOD could have deposited funds stemming from the transfers described herein

48.     Thus, the Plaintiffs must conclude that WOOD has not provided the proceeds from the property and mortgage interests that he transferred or liquidated to the Plaintiffs, the rightful recipients of any such funds.

49.     Rather, WOOD retained the proceeds from the liquidations for his personal benefit, and is believed to have used a portion of the proceeds to pay his creditors, or has funneled the proceeds into entities owned or controlled by WOOD or the other Defendants.

*The Properties at Issue Discovered Thus Far*

50.     Plaintiffs collectively have interests, either as mortgages or REOs, in approximately 40 properties in the United States, spanning roughly 18 different states.

51.     Plaintiffs are engaged in an ongoing investigation as to the status of the properties in which they have interests and anticipate needing to amend this Complaint to allege additional improper conveyances executed by WOOD to other Defendants and third parties.

**The Alaska Property**

52     HPC US Fund 2, L.P. ("HPC US 2") has an interest in the "Alaska" property

53.     The Alaska property consists of a mobile home park located at 2208 Eureka Street, Anchorage, Alaska 99503 and a condominium located at 600 Barrow Street, Anchorage, Alaska 99501.

54.    On or about April 12, 2013, WOOD attempted to convey the Alaska property without the knowledge or permission of HPC US 2. *See* Exhibit "1."

55.    The deed purported to convey the property to WELLESLEY.

56.    According to a draft deed retrieved from the Blackport office and signed by WOOD, WOOD expected to receive $51,000 00 in return for the deed to WELLESLEY, which is far below the approximate actual value of the property. *See* Exhibit "2."

57.    On or about May 14, 2013, WOOD signed a corrective special warranty deed conveying the property to WELLESLEY. *See* Exhibit "3."

58    WELLESLEY sold the Alaska property to Holland's Holdings, LLC on or about May 22, 2013 by statutory warranty deed, signed by BURGESS on May 14, 2013. *See* Exhibit "4 "

59    According to a wire transfer document from the title company involved, WELLESLEY received approximately $850,460.14 in return for the property. *See* Exhibit "5."

60    According to documents retrieved from the Blackport office, there was originally an agreement for HPC US 2, and minority owners, to sell the property to Holland's Holdings, LLC for $1,050,000.00 *See* Exhibit "6."

61.    It is estimated that the interest in the Alaska property held by HPC US 2 was worth approximately $1.4 million.

62    The Municipality of Anchorage lists the 2013 taxable value of the property as $884,600 00 *See* Exhibit "7."

63.    Thus, the Alaska property was sold to WELLESLEY for less than reasonably equivalent value.

64      Without informing HPS US 2 that the property had already been sold to WELLESLEY, WOOD represented on or about July 18, 2013 to HPC US 2 that as of July 15, 2013 the property was set for closing at a sale price of $1,050,000.00, implying that the proceeds of the sale would go to HPC US 2 *See* Exhibit "8," WOOD's email and status reports attached thereto

### The Atlantic City Property

65      HPC US 1 has an ownership interest in a property known as the "Atlantic City" property, which consists of 109 & 111 S Lincoln Place and 3525 & 3527 Boardwalk, Atlantic City, New Jersey

66.     This property is involved in the Wextrust Receivership.

67.     WOOD knew about the receivership and its connection to the Atlantic City property because in his May 2013 status report, WOOD represents that no marketing for the property will take place until the Wextrust litigation is complete.

68      On or about July 18, 2013, WOOD wrongfully held out to HPC US 1 that the Atlantic City property had not been sold. *See* Exhibit "8."

69.     On or about December 6, 2012, however, WOOD had executed a quit claim deed, granting the property from Wextrust/HPC Mortgage Fund, L.P. to ATLANTIC CITY PROPERTIES, LLC. *See* Exhibit "9."

70.     The conveyance to Atlantic City Properties, LLC was improper for several reasons:

    a      The property was subject to the receivership;

    b.     WOOD did not have authority from HPC US 1 or Wextrust/HPC Mortgage Fund, L.P. to convey the property; and

       c.      Because, according to the Receiver, HPC US 1's interest has been subordinated to that of another creditor and the Superior Court of New Jersey ordered that the property be deeded to that superior creditor in Atlantic County, Case No  C-73-09.

71.    According to WOOD's status report, HPC US 1 had invested $1,312,500.00 in the property via its mortgage interest. *See* Exhibit "8 "

### The Trailgate Property

72.    HPC US 2 has an ownership interest in the property known as "Trailgate," an equestrian center located at 4517 96th Street East, Tacoma, Washington 98466.

73    On or about July 18, 2013, WOOD represented to HPC US 2 that the property remained in HPC US 2's portfolio. *See* Exhibit "8."

74.    Specifically, the status report emailed to Mr. Pirgmann and Mr. Andreas Brinke, as representatives of Plaintiffs, on July 18, 2013 states that as of July 15, 2013 there were title issues on the property for which a release was supposed to be forthcoming. *See* Exhibit "8 "

75.    On or about July 17, 2013, however, WOOD signed a warranty deed conveying the property to WELLESLEY. *See* Exhibit "10 "

76.    As part of its investigation, HPC US 2 has been told by a third party that WOOD sold the property for $750,000.00; however, that party represented the sale date as mid 2012, not 2013 as shown on the deed.

77.    According to WOOD's status report, HPC US 2 invested roughly $1,080,000.00 in the property. *See* Exhibit "8 "

**The Myra Jordan Property**

78      Both HPC US 1 and HPC US 2 have an ownership interest in a property known as the "Myra Jordan" property, a multi-family residential building located at 1424 L Street SE, Washington, DC 20003.

79.      On or about July 18, 2013, WOOD represented to Plaintiffs that the property had not been sold and remained in Plaintiffs' portfolios. *See* Exhibit "8."

80      The July 2013 status report makes no mention of the Wextrust Receivership, which also affects this property. *See* Exhibit "8 "

81      The status report is false because WOOD had already sold the property despite the pending receivership.

82.      On or about December 9, 2011, WOOD signed a deed conveying the property from Wextrust/HPC Mortgage Fund, L.P. to 1424 L Street, LLC in exchange for $800,000.00 *See* Exhibit "11."

**The Secret Lake Property**

83.      HPC US 1 has an ownership interest in a property known as the "Secret Lake" property, 11.44 acres of land located at Captain Kidd Blvd., Kissimmee, Florida 34747.

84.      On or about July 18, 2013, WOOD represented to HPC US 1 in a status report that the property had not been sold, but that it had been listed for sale at $2.2 million as of June 15, 2013 *See* Exhibit "8 "

85.      On or about May 10, 2013, however, WOOD had executed a quit claim deed conveying the property to RITE TIMING SERVICE CORP. *See* Exhibit "12 "

3-cv-61825-RLR   Document 1   Entered on FLSD Docket 08/22/2013   Page

**The Commodore Plaza Property**

86.     The property located at 3162 Commodore Plaza, Miami, Florida 33133 is known as the "Commodore Plaza" property.

87.     HPC US 2 was the mortgagee of the property by that certain mortgage, Official Records of Miami-Dade County, Book 27239, Pages 2676-26881, with a principal amount of $1.2 million. *See* Exhibit "13."

88.     On or about July 18, 2013, WOOD represented to Plaintiffs that the total amount remaining on the loan payoff for HPC US 2's interest is $1,140,917 00 and that the total cash received to date was $59,957.00. *See* Exhibit "8."

89     The status report also represented that an auction is set, which would lead to an REO interest in the property *See* Exhibit "8 "

90     According to the Miami-Dade Clerk of Courts records, in an action brought by HPC US 2 for foreclosure of the property, no such auction date had been set. Rather, a sale date of July 22, 2013 was set for at least a portion of the property in an action brought by First Bank of Miami in which partial summary judgment was granted in favor of the bank and against HPC US 2. *See* Miami-Dade Official Records, Book 28593, Page 2272 and *HPC US Fund 2, L P  v WCG Real Estate Miami, Inc.*, 2010-42046-CA-01. *See* Composite Exhibit "14 "

91     On or about April 22, 2013, however, WOOD had assigned the mortgage to DE LOS REYES PROPERTIES. *See* Exhibit "15 "

92.     On or about May 20, 2013, DE LOS REYES PROPERTIES recorded a partial release of the mortgage. *See* Exhibit "16."

93     Thus, it appears that DE LOS REYES PROPERTIES has received funds as a result of the assignment of the mortgage.

**The Jaramillo Apartments II Property**

94     HPC US 2 has a mortgage interest over the property known as the "Jaramillo Apartments II" property, located at 946 SW 4th Street, Miami, Florida 33130 and 3125 NW 132 Terrace, Opa Locka, Florida 33054

95     HPC US 2's mortgage interest is recorded in the Miami-Dade County Official Records at Book 27358, Page 3983, showing a balloon payment of $750,000 00 due to HPC US 2.

96     On or about July 18, 2013, WOOD represented to HPC US 2 that it continued to hold a mortgage interest in the property and that a payoff may occur via sale of the property by the borrower. *See* Exhibit "8 "

97.    Without the knowledge or permission of HPC US 2, WOOD recorded two satisfactions of mortgage for the property, with the dates of recording as July 3, 2012 and November 2, 2011. *See* Composite Exhibit "17."

**The 56 Walker Property**

98     HPC US 2 has a loan interest in the property known as the "56 Walker" property, a five story masonry loft building located at 56 Walker Street, New York, NY 10013.

99.    HPC US 2's interest in the property is subject to the Wextrust Receivership.

100    On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2, which did not disclose any assignments or involvement of the 56 Walker property with the receivership. Instead, the status report discussed a distinct suit with a superior interest holder. *See* Exhibit "8."

101   On or about January 28, 2013, WOOD executed an assignment of mechanics liens, which apparently has not been recorded in New York, purporting to assign approximately $903,433.49 in mechanics liens to TRIBECA. *See* Exhibit "18."

**The Baxter Property**

102.   HPC US 2 has a loan interest in the property located at 202 Norman Avenue, New York, NY 11222 and some additional land in New Jersey, known as the "Baxter" property.

103.   On or about July 18, 2013, WOOD sent a status report to HPC US 2. The status report stated that HPC US 2 had a 90% ownership interest in the property and had invested $360,000.00 in the property. *See* Exhibit "8."

104.   On or about June 15, 2010, however, WOOD had signed an assignment of interest in mortgage, promissory note, and loan documents to Blackport. *See* Exhibit "19."

105.   At an earlier time, Plaintiffs understood that Blackport was to receive a small mortgage interest in the property from a third party, but that interest was supposed to be in addition to HPC US 2's interest. HPC US 2 was not supposed to assign any interest directly to Blackport.

106   Regarding Blackport, Michael Pirgmann and Andre Hoffmann, the majority equity owners of Blackport at the time of the assignment, also had no knowledge of the assignment of the Baxter property and have no knowledge of monies being received by Blackport in payment of the mortgage. According to the Receiver, several Blackport bank accounts have been frozen at zero or de minimis balances. Neither Mr. Pirgmann, Mr. Hoffmann, nor Plaintiffs, are aware of any other Blackport bank accounts that have not been frozen in which the mortgage proceeds might be found.

107.    Given the balance of the Blackport accounts and Plaintiffs' accounts, Plaintiffs must conclude that it did not receive any funds in exchange for the assignment, nor did Blackport receive funds once the mortgage was assigned.

**The Deerka Property**

108.    HPC US 2 has a loan interest in a property known as the "Deerka" property, composed of 29 two-story townhomes located in Fort Lauderdale, Florida.

109    On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2 stating that HPC US 2 had invested $750,000.00 in the property and that foreclosure was being pursued. *See* Exhibit "8."

110    An earlier status report from approximately May 2013 states that the loan payoff amount is $750,000.00. *See* Exhibit "20 "

111.    On March 12, 2012, an attorney filed a UCC Financing Statement Amendment Form stating that HPC US 2's interests as a secured party were terminated. *See* Composite Exhibit "21."

112.    HPC US 2 and its representatives and advisors did not authorize the termination of its status as a secured party.

113.    On March 12, 2012, the same day as the termination, the same attorney filed a UCC Financing Statement Form listing Viv Management Company as the secured party. *See* Composite Exhibit "21."

114.    Michael Pirgmann, advisor to HPC US 2, has recently spoken with the borrower on this loan and learned that the loan has been paid off to MAYER in or around January 2013. The last payment was of approximately $60,000.00

*Relationships Among the Defendants*

115.   WOOD has a connection to all of the other Defendants  The connections between and among WOOD and the other Defendants are generally as follows, and detailed further below, based on Plaintiffs investigation so far:

a     WHYDAH is WOOD's alter ego.

b     PAN     AMERICAN     is     connected     to     MAYER,     WOOD, WELLESLEY, BRETON, and BURGESS.

c     DE LOS REYES and SUAZO, and their entities, are connected to WOOD.

116.   According to the Florida Department of State, Division of Corporations, WOOD is the president, incorporator, sole director, and registered agent of WHYDAH. *See* Composite Exhibit "22 "

117.   According to promissory notes recovered from the Blackport office, WHYDAH has issued notes promising to repay the sum of money it borrowed in full within roughly two weeks of the date of the note at an interest rate of twenty percent (20%). WOOD signed the notes.

118.   The listed address for WHYDAH is 901 SE 17th Street, Suite 206, Fort Lauderdale, Florida 33316, the same address as Blackport and an address previously used for HPC US 1 and HPC US 2. *See* Composite Exhibit "22."

119   According to check stubs recovered from the Blackport office, checks have been written from WHYDAH accounts to WOOD multiple times in 2011 and 2013. *See* Composite Exhibit "23."

120    Until July 19, 2012, WOOD was listed with the Florida Department of State, Division of Corporations as a manager and registered agent of PAN AMERICAN. *See* Composite Exhibit "24."

121    The listed address for PAN AMERICAN is 901 SE 17th Street, Suite 205, Fort Lauderdale, Florida 33316, one suite over from the Blackport office. *See* Exhibit "26."

122.    HPC US 2 received its interest in the Decika property via an assignment from PAN AMERICAN on or about November 30, 2009  *See* Composite Exhibit "21."

123.    The assignment to HPC US 2, recorded in the Broward County Official Records, Book 46520, Page 717, is signed by MAYER as general partner of the Thomas S. Mayer Family Limited Partnership  *See* Composite Exhibit "21." According to the terms of the assignment, PAN AMERICAN had previously assigned its interest to the Thomas S. Mayer Family Limited Partnership.

124.    On a prior June 29, 2009 UCC Financing Statement Form listing PAN AMERICAN as the secured party, WOOD is listed as the contact person. *See* Composite Exhibit "21."

125.    Some of the WHYDAH check stubs show payments to PAN AMERICAN totaling roughly $91,650 00 over a one year period beginning in February 2011. *See* Exhibit "25."

126    Until August 1, 2013, WELLESLEY was listed with the Florida Department of State, Division of Corporations as a manager member of PAN AMERICAN. *See* Exhibit "27."

127.    BRETON and BURGESS, principals of WELLESLEY, previously worked out of the same office space as that used by Blackport

128.   The same address was used for WELLESLEY up until as recently as September 13, 2012, when the address switched to suite number 205, the same address as PAN AMERICAN *See* Composite Exhibit "28 "

129.   As of January 15, 2013, WELLESLEY has the following address listed with the Florida Department of State, Division of Corporations: 305 S Andrews Ave, Suite 203, Fort Lauderdale, Florida 33301. *See* Composite Exhibit "28."

130.   The Plaintiffs have now discovered that BRETON has previously been sanctioned by the Securities Exchange Commission for violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Rules 13a-14 and 13b2-1 of the Exchange Act. *See* Exhibit "29."

131    WOOD, WELLESLEY (as f/k/a PAN AMERICAN), BURGESS, and MAYER are also being sued in the Eastern District of New York  The plaintiffs in that case allege a Ponzi scheme and bring causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S C  § 1962. *See Yovel-Bash, et al  v  Wood, et al* , Case No : 1:12-cv-05280-JMA (hereinafter the "New York Ponzi scheme case").

132    According to WOOD's affidavit filed in the New York Ponzi scheme case, WELLESLEY was formed by WOOD and BURGESS, and purchased an ownership interest in PAN AMERICAN  *See* Exhibit "30."

133.   In that same affidavit, dated April 12, 2013, WOOD states that he holds the role of "Class A management position" with PAN AMERICAN. *See* Exhibit "30."

134.   In addition to the New York Ponzi scheme case, there has been a Securities and Exchange Commission investigation of PAN AMERICAN, which apparently ended in a failure to recommend that an enforcement action be taken by the SEC  *See* Exhibit "30 "

135.     As recently as December 22, 2011, WOOD used a Blackport employee, Keyla Sarduy, to direct communications with the plaintiff in the New York Ponzi scheme case. *See* Exhibit "31."

136.     According to an affidavit filed by the New York Ponzi scheme plaintiff, WOOD was involved with PAN AMERICAN since 2003, signing promissory notes ranging from that date to 2012. *See* Exhibit "32."

137     According to the same affidavit, BURGESS sent an email on April 10, 2012 stating that WOOD personally and/or WELLESLEY had been funding PAN AMERICAN's interest payments  *See* Exhibit "32 "

138.     The affidavit then alleges that BURGESS' statements regarding PAN AMERICAN's "cash flow" issues are belied by an online statement discussing the business' prosperity and stating that WELLESLEY acquired ownership and control over PAN AMERICAN in the fall of 2011. *See* Exhibit "32 "

139.     According to check stubs recovered from the Blackport office, PAN AMERICAN paid at least $1,500.00 to WELLESLEY in 2011. *See* Exhibit "33," at bates label 253, check no 1029.

140     The same check stubs also show payments to WHYDAH ($3,000), BURGESS ($200) and WOOD ($2000) in 2011. *See* Exhibit "33," at bates label 254, check no. 1006, bates label 255, check no. 1044; and bates label 256, check no. 1007, respectively

141.     Check stubs for WHYDAH show some payments to WELLESLEY, BRETON, and BURGESS in early 2012. *See* Exhibit "34," at bates label 258, check no. 1828; bates label 259, check no. 1935; and bates label 260, check no. 1939, respectively

142.    As of August 11, 2013, the website www.wellesleyfunds.com shows the Atlantic City property and the properties making up the Jaramillo II property as some of the fund's completed projects The website also indicates that BURGESS and BRETON are officers of the "Wellesley Fund" team. *See* Exhibit "35."

143.    Several    of    the    properties    listed    as    completed    projects    on www.wellesleyfunds.com are properties that WOOD represented to Plaintiffs were part of Plaintiffs REO and loan interest portfolios.

144.    According to check stubs recovered from the Blackport office, WELLESLEY paid Blackport Property Management Division, a fictitious name registered by WHYDAH, approximately $14,550.00 in March of 2012. *See* Exhibit "36," at bates label 283, check no. 1002

145.    Check stubs for a WHYDAH account from the same address, show WELLESLEY being paid approximately $17,000.00 in 2011 and $10,000.00 in April 2013 *See* Exhibit "34," at collectively (bates label 262, check no. 1522; bates label 263, check no. 1631; bates label 264, check no. 1644; bates label 265, check no 1730) and bates label 267, check no 2255, respectively.

146.    DE LOS REYES signed the deed for the sale of the Secret Lake property as a witness. *See* Exhibit "12."

147    The Secret Lake property was sold to RITE TIMING, the president of which is SUAZO. *See* Exhibit "37 "

148    SUAZO is also the registered agent for DE LOS REYES PROPERTIES. *See* Exhibit "38."

149.    DE LOS REYES is the manager member of DE LOS REYES PROPERTIES. *See* Exhibit "38."

150     DE LOS REYES is also manager of TRIBECA, the company to which WOOD executed an assignment of HPC US 2's interest in several mechanic's liens regarding the 56 Walker property. *See* Exhibit "39."

151.    The assignment regarding the 56 Walker property lists the principal place of business of TRIBECA as the same address as the Blackport office. *See* Exhibit "18."

152.    DE LOS REYES is also the manager of ATLANTIC CITY PROPERTIES according to the Florida Department of State, Division of Corporations *See* Exhibit "40."

153.    Mr. Pirgmann was told by DE LOS REYES that WOOD owed him $1 million.

154     According to check stubs recovered from the Blackport office, an account titled Blackport Investment Group, LLC d/b/a HPC Loan Servicer issued a check to DE LOS REYES for approximately $19,798.31 in December 2012. *See* Exhibit "41," at bates label 298, check no 1497

155.    Other check stubs for Blackport d/b/a HPC Loan Servicer show approximately $38,000 00 being paid to WOOD in 2011. *See* Exhibit "41," at bates labels 299-305.

156     Check stubs from the same address for WHYDAH accounts show DE LOS REYES PROPERTIES being paid $19,500 00 in May 2013. *See* Exhibit "34," at bates label 268, check no. 2298

157.    Likewise, a WHYDAH check stub shows DE LOS REYES PROPERTIES being paid $244,687 57 in March 2013 and $10,000 00 in April 2013. *See* Exhibit "34," at bates label 269, check no. 2239 and bates label 270, check no. 2259, respectively.

158.   Another WHYDAH check stub shows DE LOS REYES PROPERTIES being paid $585,000 00 for "payoff Kissimee post-dated" dated June 14, 2013. *See* Exhibit "34," at bates label 271, check no. 2300

159.   The only property interest belonging to Plaintiffs located in Kissimmee is Secret Lake, which was sold to RITE TIMING on approximately May 10, 2013. *See* Exhibit "12."

160   Other WHYDAH check stubs state that they were "handed to" DE LOS REYES. *See* Exhibit "34," at bates labels 273 and 275.

161.   According to the Florida Department of State, Division of Corporations, Aviva Mayer is the president and director of Viv Management Company, the company that was listed as secured party on the UCC Financing Statement Form for the Deerka property on the same day that HPC US 2 was removed, without its authorization or knowledge. *See* Exhibit "42."

162   Aviva Mayer is the sister of MAYER according to the Affidavit of Ruth Yovel-Bash filed in the New York Ponzi scheme case *See* Exhibit "32."

163.   MAYER is listed as a defendant in the New York Ponzi scheme case.

164   According to the Florida Department of State, Division of Corporations, MAYER was also a manager member of PAN AMERICAN until June 10, 2011. *See* Exhibit "43 "

165.   Check stubs from the Blackport office for an account titled "HPC Loan Servicer" show the following payments to the Defendants:

  a) WELLESLEY – March 2011 - $3,500.00 – description: short term loan. *See* Exhibit "44," at bates label 313, check no. 1430.

  b) WELLESLEY – August 2011 - $337.20 – description: travel expenses for DI Greensboro (a HPC US 1 property now appearing on the WELLESLEY

website) for "PMB" (BURGESS' initials) *See* Exhibit "44," at bates label 311-A, check no. 1078.

c) WHYDAH – March 2012 - $4,500.00 *See* Exhibit "44," at bates label 317, check no. 1345.

d) WHYDAH – April 2010 - $7,500.00 and $20,000.00. *See* Exhibit "44," at bates label 311, check no. 1078 and bates label 312, check no. 1083, respectively.

e) PAN AMERICAN – February 2012 - $1,000.00 and $3,000.00. *See* Exhibit "44," at bates label 315, check no. 1291 and bates label 316, check no. 1313.

f) PAN AMERICAN – April 2012 - $1,700.00. *See* Exhibit "44," at bates label 318, check no. 1403.

166.    As Plaintiffs continue to investigate, additional payment information will likely be uncovered regarding monies flowing among the Defendants and necessitating amendments to the Complaint.

167.    Both WELLESLEY and DE LOS REYES have inside information regarding Plaintiffs because both entered into negotiations to purchase the Plaintiffs, as part of their parent company. WOOD brought both potential buyers to Plaintiffs. WELLESLEY's negotiations occurred from roughly early to mid 2012 and DE LOS REYES' negotiations took place from approximately the end of 2012 through mid 2013

168    Apparently, WOOD was conveying properties to both DE LOS REYES and WELLESLEY around the same time as the acquisition talks, and in the case of WELLESLEY, even after negotiations had ended

### COUNT I – VIOLATION OF 18 U.S.C. § 1962(c) – CIVIL RICO

169.    Plaintiffs adopt and reallege paragraphs 1 through 168 above as if fully set forth herein

170.    This Count is against Defendants WOOD, WHYDAH, WELLESLEY, BURGESS, and BRETON (the "RICO Defendants")

171.    The RICO Defendants each meet the definition of a "person" as defined in 18 U.S.C. § 1961(3).

172     The RICO Defendants collectively make up an associated in fact enterprise pursuant to 18 U.S.C § 1961(4).

173.    The enterprise is an association in fact enterprise because, based on the evidence thus uncovered and attached hereto, the RICO Defendants have come together for the purpose of engaging in the complained of conduct alleged herein.

    a       The RICO Defendants have the common purpose of engaging in
            fraudulent investment schemes based upon real property ownership
            and loan interests

    b.      Specifically, the RICO Defendants have associated together for the
            purpose of engaging in a course of conduct that includes defrauding
            Plaintiffs by transferring Plaintiffs' real property interests without
            the knowledge or permission of Plaintiffs and without accounting for
            the proceeds to Plaintiffs.

    c       The RICO Defendants in particular have intentionally participated in
            a scheme to deprive Plaintiffs of money and/or property, used the

mails and/or wires in the furtherance of that scheme, and Plaintiffs relied to their detriment on the RICO Defendants misrepresentations.

d       The RICO Defendants have come together to function as a continuing unit with regard to perpetrating the alleged fraudulent activity via mail and/or wire fraud.

e       The RICO Defendants and the enterprise are separate and distinct. Each of the RICO Defendants are free to act independently of each other and to advance their own separate interests

174.    The RICO Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

175.    The RICO Defendants committed more than two predicate acts within a ten-year time span because they have committed violations of 19 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) numerous times since at least 2011. Specifically:

a.      The RICO Defendants did transmit or cause to be transmitted by wire, communications in interstate commerce, including writings or sounds for the purpose of executing the above referenced scheme to defraud, in violation of 18 U S C. § 1343, which prohibits fraud by wire.

b.      In addition, the RICO Defendants, for the purpose of executing or attempting to execute the scheme to defraud, did place, or cause to be placed in an authorized depository, a matter or thing to be sent or delivered by the Postal Service or by a private or commercial carries.

These acts constitute criminal violations of the United States laws prohibiting mail fraud as set out in 18 U.S.C. § 1341.

c.  Specifically, the RICO Defendants sent or caused to be sent emails, status reports, deeds, assignments, and other documents related to the fraudulent transfer of Plaintiffs' property interests outside the State of Florida as alleged herein and attached hereto as exhibits, via either mail or wire.

d.  The RICO Defendants use of the mails and wires allowed them to effect the scheme of concealing fraudulent transfers of Plaintiffs' properties from Plaintiffs, placing the properties in the hands of entities owned or controlled by the enterprise, and marketing those properties to other potential investors.

e.  The activities detailed herein affect interstate and foreign commerce

f.  Predicate Act # 1

1)  On or about July 18, 2013, WOOD emailed the Plaintiffs (via their representatives) status reports discussing Plaintiffs' real estate and mortgage interests. *See* Exhibit "8."

2)  The status report falsely represented to Plaintiffs that certain properties and mortgage interests remained a part of Plaintiffs' portfolios.

3)  In reality, Plaintiffs' interests had been conveyed, transferred, or otherwise fraudulently removed from

Plaintiffs' ownership or control on or about the following dates: Alaska (April 12, 2013), Atlantic City (December 6, 2012); Trailgate (July 17, 2013); Myra Jordan (December 9, 2011), Secret Lake (May 10, 2013), Commodore Plaza (April 22, 2013); Jaramillo II (November 2, 2011 and July 3, 2012); 56 Walker (January 28, 2013); Baxter (June 15, 2010), and Deerka (May 12, 2012).

4) WOOD sent his email to representatives of Plaintiffs, Mr. Pirgmann and Mr. Brinke, that WOOD knew were located in Germany.

5) WOOD intended to defraud Plaintiffs by sending false status reports

6) Plaintiffs' reliance on the false status reports gave WOOD and the other RICO Defendants, additional time to wrongfully convey or assign other interests belonging to Plaintiffs and protected the RICO Defendants from Plaintiffs' discovery of the conveyances and assignments that had already taken place.

7) WOOD has previously emailed status reports to email addresses located outside of the United States on numerous occasions since early 2010.

8) The misrepresentations made to Plaintiffs would have been relied upon by a reasonable person

g. Predicate Act # 2

    1) On or about October 17, 2011, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "45."

    2) The report represented to HPC US 2 that its ownership interest in the loan on the Baxter property was 90% and does not mention a prior assignment of mortgage to Blackport.

    3) The report was false because on or about June 15, 2010, WOOD had signed an assignment of the mortgage on the Baxter property to Blackport.

h. Predicate Act # 3

    1) On or about February 15, 2012, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "46."

    2) The report represented to the Plaintiffs that the Myra Jordan property was still in Plaintiffs' portfolios and that the property would be continued to be marketed for sale.

    3) The report was false because on or about December 9, 2011, WOOD had deeded the property to a third party.

      i.     Predicate Act # 4

           1) On or about November 26, 2012, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "47."

           2) The report represented to the Plaintiffs that the Deerka property was still in HPC US 2's portfolio and that a payoff of the loan was expected after a summary judgment hearing.

           3) The report was false because according to UCC filings on or about March 12, 2012, HPC US 2's status as a secured party had been terminated and a new secured party had been listed, Viv Management Company, an entity controlled by MAYER's sister.

      j.     Predicate Act # 5

           1) On or about February 7, 2013, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "48."

           2) The report represented to the Plaintiffs that the loan for the Jaramillo II property was being paid at $7,500.00 per month.

           3) The report was false because on or about November 2, 2011 and July 3, 2012, WOOD had recorded satisfactions of the loan on the Jaramillo II property.

k      Predicate Act # 6

    1)  On or about May 14, 2013, WELLESLEY sent or caused to be sent by wire a statutory warranty deed regarding the Alaska property that was recorded by May 22, 2013. *See* Exhibit "4."

    2)  BURGESS signed the deed and was required to transmit his signature to other parties to sign located at a minimum in the states of Washington and Hawaii.

    3)  Sending the deed allowed the RICO Defendants to receive a significant sum of money for the sale of the Alaska property to a third party to HPC US 2's detriment. The RICO Defendants had already fraudulently transferred the property out of HPC US 2's name whereby WELLESLEY paid less than reasonably equivalent value for the property.

l.      Predicate Act # 7

    1)  On or about December 10, 2012, WOOD mailed or caused to be mailed a quit claim deed, attached hereto as Exhibit "9," to be recorded in Atlantic County, New Jersey.

    2)  The deed states that it was prepared by WOOD.

    3)  The deed states that Wextrust/HPC Mortgage Fund L.P. conveys the property to ATLANTIC CITY PROPERTIES

4) The website, www.wellesleyfunds.com, displays the Atlantic City property as a completed project and lists BRETON and BURGESS as officers of WELLESLEY.

5) At all relevant times, WOOD's status reports represented to HPC US 1, that the Atlantic City property remained in its ownership portfolio

m.   Predicate Act # 8

1) On or about July 17, 2013, the RICO Defendants, mailed or caused to be mailed or sent by wire or caused to be sent by wire, a warranty deed conveying the Trailgate property. *See* Exhibit "10 "

2) The deed conveyed the property to WELLESLEY and was improperly signed by WOOD

n   Predicate Act # 9

1) On or about December 9, 2011, WOOD sent or caused to be sent, by mail or wire, a deed conveying the Myra Jordan property to a third party in exchange for $800,000.00  *See* Exhibit "11."

o.   Predicate Act # 10

1) On or about June 15, 2010, WOOD sent or caused to be sent, by mail or wire, an assignment of interest in mortgage, promissory note, and loan documents to New York. *See* Exhibit "19."

> 2) This action was part of the fraudulent scheme to convey away Plaintiffs' assets because the assignment at issue, regarding the Baxter property, was not disclosed to HPC US 2 and continued to be represented to HPC US 2 as part of its portfolio well after the assignment.

176.   Pursuant to and in furtherance of their fraudulent scheme, the RICO Defendants committed multiple related acts of mail and wire fraud

177.   The acts of mail and wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S C. § 1961(5).

178.   The predicate acts of mail and wire fraud are related to each other by virtue of common participants, common victims, common methods of commission, a common purpose, and a common result.

179.   The illegal conduct is of a continuous nature and presents the threat of future illegal conduct

180.   The RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

181.   As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U S C  § 1962(c), Plaintiffs have been injured in their business and property in that.

> a.   The acts of mail and wire fraud enabled the conveyance of Plaintiff's real property interests without Plaintiffs' knowledge and without any benefit accruing to Plaintiffs. Plaintiffs have received no funds from

the transfers described herein and in some instances has been denied the value received by the RICO Defendants upon sale of the properties to a third party.

b.    The deeds and assignments effectively transferred Plaintiffs' property interests to the other Defendants or third parties to the direct harm of Plaintiffs.

c    Regarding the status reports and annual statements sent to Plaintiffs on multiple occasions, Plaintiffs relied on the misrepresentations and omissions contained therein to their detriment.

d.    While investigation is still ongoing, Plaintiff has discovered losses amounting to approximately $10 million regarding the properties specifically alleged herein.

e    Plaintiffs' injuries are a reasonably foreseeable, concrete result of the RICO Defendants' acts of mail and wire fraud

WHEREFORE, Plaintiffs demand judgment against the RICO Defendants for all damages including. pre-judgment and post-judgment interest, actual damages, treble damages, reasonable attorneys' fees and costs, pursuant to 18 USC § 1964, and any further relief as this Court deems just and proper.

## COUNT II – VIOLATION OF 18 USC §1962(d) – RICO CONSPIRACY

182.    Plaintiffs adopt and reallege paragraphs 1 through 168, and 169 through 181 (Civil RICO), above as if fully set forth herein.

183    This Count is against the RICO Defendants, as defined in Count I.

184    As set forth above, the RICO Defendants, via the predicate acts of mail and wire fraud, furthered a scheme to defraud Plaintiffs. In some instances, the property interests were conveyed to one of the Defendants in order for that Defendant to sell the interest at a significantly increased price or to receive payments from the borrower of a mortgage. In other instances, Plaintiffs properties were later used by a Defendant, like WELLESLEY, to induce third parties to invest with that Defendant

185.    The RICO Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. At the very least, the relationships and connections among the RICO Defendants, and their conduct as described in this Complaint, infers the existence of a conspiracy. The foregoing is sufficient to show a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U S C  § 1962(d).

186.    As a direct and proximate result of the RICO Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Plaintiffs' property interests have been conveyed out of Plaintiffs' portfolio without the knowledge of Plaintiffs  or the benefit of such conveyances accruing to Plaintiffs. In many instances, Plaintiffs' property interests were conveyed for less than reasonably equivalent value by WOOD to the other Defendants and then generating a significant amount of money once in the hands of those Defendants that would otherwise have accrued to Plaintiffs.

WHEREFORE, Plaintiff requests that this Court enter judgment against the RICO Defendants as follows: including actual damages, treble damages, attorneys' fees and costs, and any and all such further relief as this Court deems just and proper.

## <u>COUNT III -- VIOLATION OF FLA. STAT. § 895.03 (FLORIDA RICO)</u>

187.    Plaintiffs adopt and reallege paragraphs 1 through 168 above as if fully set forth herein.

188    Plaintiffs particularly incorporate the allegations made above with respect to the federal RICO causes of action, paragraphs 169 through 186.

189.    This Count is against all of the RICO Defendants, as defined in Counts I and II.

190    The RICO Defendants have violated Fla. Stat. § 895.03(3) and (4)

191    The RICO Defendants have engaged in a racketeering activity as defined in Fla. Stat. § 895.02(1)(b) by virtue of the conduct described in Count I as amounting to racketeering activity under 18 U S C. § 1961(1).

192    The RICO Defendants have also conspired or endeavored to violate Fla  Stat. § 895.03(3).

193    The RICO Defendants make up an enterprise as defined in Fla  Stat. § 895.02(3).

194    The enterprise has engaged in a pattern of racketeering activity as defined in Fla. Stat  § 895.02(4), and as more particularly described in Count I, and conspiracy to do so as described in Count II.

WHEREFORE, Plaintiffs demand judgment against the RICO Defendants for all damages and equitable relief including  injunctive relief, pre-judgment and post-judgment interest, actual damages, treble damages, reasonable attorneys' fees and costs, pursuant to Fla. Stat. § 895.05, and any further relief as this Court deems just and proper

## COUNT IV – FRAUD

### (AGAINST WOOD)

195.    Plaintiffs adopt and reallege paragraphs 1 through 168 above as if fully set forth herein.

196.    WOOD made material false statements to Plaintiffs that their property interests continued to belong to them via status reports and annual statements.

197.    In reality, WOOD had already conveyed or assigned Plaintiffs' interests in the properties to third parties, including other Defendants.

198.    Because no one has accounted to Plaintiffs for any proceeds and given the de minimus balances of Plaintiffs' bank accounts, Plaintiffs can only conclude that WOOD retained the proceeds of all such conveyances or assignments for his own use or transferred the proceeds to third parties or other Defendants for his benefit.

199.    WOOD also benefitted from conveying monies from Plaintiffs' accounts and Plaintiffs' property interests to certain other Defendants.

200.    WOOD knew or should have known that the statements were false at the time he made the material false statements.

201     WOOD made the statements with the purpose of inducing Plaintiffs to rely on those statements and to permit WOOD to have continued access to Plaintiffs' property interests without Plaintiffs discovering the conveyances and assignments of their property interests

202.    Plaintiffs justifiably relied on WOOD's false statements to their detriment.

203.    As a result of Plaintiffs' detrimental reliance, Plaintiffs suffered damages as a direct and proximate result of WOOD's fraud

WHEREFORE, Plaintiffs demand judgment against WOOD for all damages including: pre-judgment and post-judgment interest, and any further relief as this Court deems just and proper.

## COUNT V – CONSTRUCTIVE TRUST

204.    Plaintiffs adopt and reallege paragraphs 1 through 168, and 195 through 203 (Fraud), above as if fully set forth herein

205    WOOD perpetrated a fraud against Plaintiffs.

206.    Alternatively, WOOD had a confidential relationship with Plaintiffs

207    WOOD's relationship with the Plaintiffs enabled him to have access to Plaintiffs' property interests.

208    As part of the relationship, WOOD made an implied promise that the status reports and annual statements he would provide to Plaintiffs regarding their property interests would be true and correct.

209.    WOOD has impermissibly and fraudulently conveyed and assigned Plaintiffs' property interests and has not accounted to Plaintiffs for proceeds received by WOOD as a result of his transfers of Plaintiffs' property interests to third parties and other Defendants, such as WELLESLEY, RITE TIMING, TRIBECA, ATLANTIC CITY PROPERTIES, and DE LOS REYES PROPERTIES.

210.    WOOD has continued to represent to Plaintiffs on status reports and annual statements that Plaintiffs' property interests remained in Plaintiffs' ownership or control even after conveying or assigning the same to other Defendants and third parties

211.    WOOD has been unjustly enriched by his impermissible transfers of Plaintiffs' property interests.

212     As a direct and proximate result of WOOD's actions, Plaintiffs have been harmed by the transfer of their property interests without Plaintiffs' knowledge and without compensation for the same.

213     In order to return those property interests to Plaintiffs, a constructive trust should be imposed because even where WOOD received funds in exchange for the conveyance of Plaintiffs' interests, the funds received appear to be significantly less than the value of the property interest conveyed.

WHEREFORE, Plaintiffs respectfully request that this Court impose a constructive trust on Plaintiffs' property interests that have been fraudulently transferred by WOOD to other Defendants and third parties, issue a preliminary injunction to protect the availability of the equitable remedy of constructive trust while the instant action is pending, and grant any and all such further relief as this Court deems just and proper.

## COUNT VI – CONVERSION

### (AGAINST WOOD)

214.    Plaintiffs adopt and reallege paragraphs 1 through 168 above as if fully set forth herein.

215.    Plaintiffs have a right to possession of the property interests at issue.

216.    WOOD's unauthorized actions have deprived Plaintiffs of their right to possession

217.    Specifically, WOOD has improperly conveyed away the property interests belonging to Plaintiffs without the authority to do so, without the knowledge of Plaintiffs, without accounting for the conveyances to Plaintiffs, and without providing any proceeds to Plaintiffs

218.   Given the alleged conduct by WOOD, it is not necessary to demand the return of the property because such demand would be futile.

WHEREFORE, Plaintiffs respectfully demand judgment to be entered against WOOD, and for any such other and further relief that this Court deems just and proper.

## COUNT VII – TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

### (AGAINST ALL DEFENDANTS)

219.   Plaintiff adopts and realleges paragraphs 1 through 168 above as if fully set forth herein.

220.   This Court has authority to enter an injunction to protect the availability of the equitable relief sought by Plaintiff, including but not limited to constructive trust, and pursuant to the provisions of Florida's RICO statute, section 895.05.

221.   WOOD must be temporarily and permanently enjoined from conveying property interests belonging to Plaintiffs.

222    WELLESLEY knew or should have known that WOOD did not have authority to convey the property interests at issue on behalf of Plaintiffs.

223.   BRETON and BURGESS knew or should have known that WOOD did not have authority to convey the property interests at issue on behalf of Plaintiffs, and used WELLESLEY, their alter ego, to receive the property interests conveyed by WOOD

224.   DE LOS REYES knew or should have known that WOOD did not have authority to convey the property interests at issue on behalf of Plaintiffs, and used his alter ego companies, DE LOS REYES PROPERTIES, TRIBECA, and ATLANTIC CITY PROPERTIES, to receive the property interests conveyed by WOOD.

225.    Upon information and belief, SUAZO had knowledge that WOOD did not have authority to convey the property interests at issue on behalf of Plaintiffs, and used his alter ego company, RITE TIMING, to receive the property interests conveyed by WOOD.

226.    Plaintiffs have demonstrated a substantial likelihood of success on the merits.

227.    Failure to grant an injunction will result in irreparable injury or harm to Plaintiffs

228     These injuries include, but are not limited to, loss of the properties and funds belonging to or rightfully owed to Plaintiffs

229     The injuries alleged herein outweigh any damage that the injunction may cause Defendants.

230.    The requested injunctive relief will not disserve the public interest because this is a private dispute.

231     Under these circumstances, the balance of hardships favors Plaintiffs.

232.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs request the Court enter an Order, and Judgment, temporarily and permanently enjoining Defendants from selling property interests which Plaintiffs have or had an interest, retaining the proceeds from sales of property interests which Plaintiffs have or had an interest, or from otherwise dissipating or misappropriating assets which belong(ed) to or were under the control of Plaintiffs or binding Plaintiffs in any way, and award any such other relief as may be just and equitable.

## COUNT VIII – UNJUST ENRICHMENT

### (AGAINST WOOD)

233   Plaintiffs adopt and reallege paragraphs 1 through 168 above as if fully set forth herein.

234.   Plaintiffs have conferred a benefit upon WOOD because WOOD sold and/or assigned property interests owned or controlled by Plaintiffs and, upon information and belief, kept the proceeds.

235.   WOOD benefitted by receiving the proceeds of the sales and assignments of Plaintiffs' property interests.

236.   WOOD also benefitted from being able to transfer Plaintiffs' interests to the other Defendants.

237.   WOOD has voluntarily accepted and retained the benefits conferred upon him

238   Plaintiffs have not received any benefit in return for the benefit conveyed upon WOOD.

WHEREFORE, Plaintiffs respectfully demands judgment to be entered in favor of the Plaintiffs and against WOOD, and for any such other and further relief that this Court deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 22, 2013

Respectfully submitted,

TRIPP SCOTT, P.A.
*Counsel for Plaintiffs*
110 Southeast Sixth Street, 15th Floor
Fort Lauderdale, Florida 33301
Telephone   (954) 525-7500
Facsimile·  (954) 761-8475


By: **/s/ Paul O. Lopez**
Paul O  Lopez, Esq.
*Florida Bar No. 983314*
pol@trippscott.com
Richard L. Petrovich, Esq
*Florida Bar No  567248*
rlp@trippscott.com
B. George Walker, Esq
*Florida Bar No. 0071049*
bgw@trippscott.com
Megan L. Janes, Esq.
*Florida Bar No  0099009*
mlj@trippscott.com