UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  13-cv-61825-RSR

HPC US FUND 1, L.P., a New York
limited partnership, and HPC US FUND 2, L.P.,
a New York limited partnership.

       Plaintiffs,

v.

DALE WOOD, an individual,
THE WHYDAH GROUP, INC., a Florida profit corporation,
WELLESLEY ASSET SECURED PORTFOLIO, INC.
a Florida profit corporation, PETER BURGESS, an individual,
ROLAND BRETON, an individual,
DE LOS REYES PROPERTIES, LLC, a Florida limited liability
company, ATLANTIC CITY PROPERTIES, LLC, a Florida
limited liability company, TRIBECA 56 WALKER, LLC,
a Florida limited liability company, GABRIEL DE LOS REYES,
an individual, RITE TIMING SERVICES CORP., a Florida profit
corporation, THOMAS MAYER, an individual,
THE THOMAS S. MAYER FAMILY LIMITED
PARTNERSHIP, a Florida limited partnership, GUNTER GIES
(a/k/a THEODOR G. GIES), an individual, THE PAN
AMERICAN FUND, LLC, a Florida limited liability company.
WCG REAL ESTATE MIAMI, INC., a Florida corporation,
GASTON M H P, INC., a corporation of
unknown origin, DEERKA CORP., a Florida
corporation, HILCREST RESIDENTIAL ALF, INC.
n/k/a PLEASANT ALTERNATIVE, INC., a Florida corporation.

       Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiffs, HPC US FUND 1, L.P. (hereinafter "HPC US 1"), a New York limited

partnership, and HPC US FUND 2, L.P. (hereinafter "HPC US 2"), a New York limited

partnership, by and through their undersigned counsel, hereby file this Second Amended

Complaint against the Defendants, DALE WOOD (hereinafter "WOOD"), individually; THE

WHYDAH GROUP, INC. (hereinafter "WHYDAH"), a Florida profit corporation; WELLESLEY ASSET SECURED PORTFOLIO, INC. (hereinafter "WELLESLEY"), a Florida profit corporation, PETER BURGESS (hereinafter "BURGESS"), individually, ROLAND BRETON (hereinafter "BRETON"), individually; DE LOS REYES PROPERTIES, LLC (hereinafter "DE LOS REYES PROPERTIES"), a Florida limited liability company; ATLANTIC CITY PROPERTIES, LLC (hereinafter "ATLANTIC CITY PROPERTIES"), a Florida limited liability company; TRIBECA 56 WALKER, LLC (hereinafter "TRIBECA"), a Florida limited liability company; GABRIEL DE LOS REYES (hereinafter "DE LOS REYES"), an individual; RITE TIMING SERVICES CORP. (hereinafter "RITE TIMING"), a Florida profit corporation; THOMAS MAYER (hereinafter "MAYER"), an individual; THE THOMAS S. MAYER FAMILY LIMITED PARTNERSHIP (hereinafter "MAYER PARTNERSHIP"), a Florida limited partnership; GUNTER GIES (a/k/a THEODOR G. GIES) (hereinafter "GIES"), an individual, THE PAN AMERICAN FUND, LLC (hereinafter "PAN AMERICAN"); WCG REAL ESTATE MIAMI, INC. (hereinafter "WCG"), a Florida corporation; GASTON M H P, INC. (hereinafter "GASTON MHP"), a corporation of unknown origin; DEERKA CORP. (hereinafter "DEERKA CORP."), a Florida corporation; HILCREST RESIDENTIAL ALF, INC. n/k/a PLEASANT ALTERNATIVE, INC. (hereinafter "HILCREST RESIDENTIAL," "PLEASANT ALTERNATIVE," or "HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE"), a Florida corporation; and any and all persons claiming any legal or equitable right, title, estate, lien, or interest in the Florida properties described in the complaint adverse to Plaintiffs' title, or any cloud on Plaintiffs' title thereto, and for which Plaintiffs seek to quiet title, and state as follows:

## PRELIMINARY STATEMENT

1.      This is an action for damages and equitable relief arising from the unauthorized transfer of Plaintiffs real estate and mortgage interests by WOOD to certain other Defendants and third parties, and the fraudulent concealment of those transfers from Plaintiffs.

2.      The Plaintiffs are investment companies which exist for the purpose of investing in the United States real estate and mortgage market.  The Plaintiffs represent the interests of roughly 1,872 German nationals who have pooled approximately $56,499,000.00 with the Plaintiffs for such investment purposes.

3.      Defendants are several individuals and entities some of which have acted in concert to defraud Plaintiffs.

4.      Specifically, WOOD misrepresented to Plaintiffs that the real estate and mortgage interests actually held by Plaintiffs remained in Plaintiffs ownership or control, while simultaneously conveying, transferring, and/or assigning Plaintiffs' interests to other Defendants and third parties without providing to or accounting for the proceeds to Plaintiffs and often in exchange for less than reasonably equivalent value.

5.      In several instances, WOOD's conduct has created a cloud on Plaintiffs' title to properties or mortgage interests in properties; thus, Plaintiffs request the following relief herein: declaration that Plaintiffs have legal and equitable interests in certain Florida properties and mortgages, rescission of certain satisfactions of or assignments of mortgages, and to quiet title over certain properties and mortgages.

## JURISDICTION AND VENUE

6.      The amount in controversy is in excess of $75,000.00, exclusive of attorneys' fees and costs.

7.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332, diversity of citizenship, 28 U.S.C. § 1331, federal question (18 U.S.C. § 1964, civil RICO), and 28 U.S.C. § 1367, supplemental jurisdiction.

8.     HPC US 1 is a limited partnership organized and authorized to do business under the laws of the State of New York.

9.     HPC US 2 is a limited partnership organized and authorized to do business under the laws of the State of New York.

10.    HPC US 1 and HPC US 2 do not have a principal place of business in Florida.  As of the date this action was filed, their principal place of business was in Germany, where their principals and majority of their management reside, coordinate corporate and business activities in the ordinary course, and coordinate litigation efforts pertaining to this lawsuit.

11.    The general partner of both HPC US 1 and HPC US 2 is HPC Fund Management, LLC, a New York limited liability company.

   a.   The sole member of HPC Fund Management, LLC is HPC Management LLC, a New York limited liability company.

   b.   The sole member of HPC Management, LLC, is HPC Capital GmbH, the German equivalent of a limited liability company.

   c.   The members of HPC Capital GmbH, are MPI Vermögensverwaltungs-und Beteiligungs GmbH and ALH Vermögensverwaltungs-und Beteiligungs GmbH, two more German limited liability company-equivalents.

   d.   The sole member of MPI Vermögensverwaltungs-und Beteiligungs GmbH is Greenbay Investment Gmbh, whose sole member is Michael Pirgmann, a German citizen domiciled in Germany.

e.   The sole member of ALH Vermögensverwaltungs-und Beteiligungs GmbH is Andre Hoffmann, a German citizen domiciled in Germany.

12.     The limited partner of HPC US 1 is Hypotheken 1 Renditefonds GmbH & Co. KG, the German equivalent of a limited partnership.

13.     The limited partner of HPC US 2 is Hypotheken 2 Renditefonds GmbH & Co. KG, the German equivalent of a limited partnership.

14.     The general partner of Hypotheken 1 Renditefonds GmbH & Co. KG and Hypotheken 2 Renditefonds GmbH & Co. KG, is US Renditefonds Verwaltungsgesellschaft GmbH, the German equivalent of a limited liability company.

15.     The members of US Renditefonds Verwaltungsgesellschaft GmbH are Andre Hoffmann and Michael Pirgmann, who are German citizens domiciled in Germany.

16.     The limited partners of Hypotheken 1 Renditefonds GmbH & Co. KG and Hypotheken 2 Renditefonds GmbH & Co. KG are collectively approximately 1,872 German citizen-investors, none of whom are domiciled in Florida.

17.     WOOD is an individual domiciled in Broward County, Florida.

18.     WHYDAH is a corporation organized and authorized to do business under the laws of the State of Florida, inactive as of September 27, 2013, and with its principal place of business located in Fort Lauderdale, Broward County, Florida.

19.     WELLESLEY is a corporation organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Fort Lauderdale, Broward County, Florida.

20.     According to state records, BURGESS is an individual domiciled in Broward County, Florida.

21.     According to state records, BRETON is an individual domiciled in Broward County, Florida.

22.     DE LOS REYES PROPERTIES is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

23.     ATLANTIC CITY PROPERTIES is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

24.     TRIBECA is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

25.     According to state records, DE LOS REYES is domiciled in Miami-Dade County, Florida.

26.     RITE TIMING is a corporation organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

27.     According to state records, MAYER is domiciled in Broward County, Florida.

28.     MAYER PARTNERSHIP is a limited partnership organized and authorized to do business under the laws of the State of Florida, with its principal place of business in Broward County, Florida.

29.     According to state records, GIES is domiciled in Broward County, Florida.

30.     PAN AMERICAN is a limited liability company organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Broward County, Florida.

31.     DEERKA CORP. is a corporation organized and authorized to do business under the law of Florida, with its principal place of business located in Palm Beach County, Florida.

32.     WCG is a corporation organized and authorized to do business under the laws of the State of Florida, with its principal place of business located in Miami-Dade County, Florida.

33.     GASTON MHP is a corporation of unknown origin; there are no filings with the Florida Department of State. Based on the address listed with the Pinellas County Property Appraiser, GASTON MHP's primary place of business appears to be located in Pinellas County, Florida.

34.     HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE is a corporation organized and authorized to do business under the laws of the State of Florida, with its principal place of business in Pinellas County, Florida.

35.     Because the relief sought herein may affect the property or mortgage interests of certain record parties, the following parties are named in this lawsuit: HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE, GASTON MHP, DEERKA CORP., and WCG.

36.     Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(1) and (2) as a substantial part of the events took place in Broward County, Florida; at least one of the Defendants resides in Broward County; and all of the Defendants are domiciled or have their principal place of business in the Southern District of Florida.

37.     Plaintiffs have retained the law firm of Tripp Scott, P.A. in this matter, and are obligated to pay the firm a reasonable attorneys' fee for its services. Plaintiffs seek reimbursement of their legal fees pursuant to 18 U.S.C. § 1964 and Fla. Stat. § 772.104.

38.     All conditions precedent to the filing of this action have been performed, satisfied, or waived.

## GENERAL ALLEGATIONS

39.     WOOD was the manager of Blackport Investment Group, LLC ("Blackport"), HPC Loan Servicer, LLC, and certain other special purpose vehicles, such as Greensboro Hotel Holdings, LLC, related to the management of Plaintiffs real estate and mortgage portfolios. Specifically, WOOD was in charge of organizing the performance of and performing the actual management services for Plaintiffs' property interests.

40.     WOOD currently holds a 49% membership interest in Blackport.

41.     Prior to the end of 2012, the ownership of Blackport was as follows: 33.34% by Michael Pirgmann; 33.33% by Andre Hoffmann; and 33.33% by WOOD.

42.     WOOD, *apparently* discharging his duties, provided periodic status reports and annual statements to the Plaintiffs, which purported to account for their respective portfolios.

43.      On or about August 1, 2013, a financial irregularity regarding repayment of $500,000.00 that had been provided to WOOD by Michael Pirgmann, 51% member of Blackport and advisor to Plaintiffs, was discovered.

44.     Mr. Pirgmann provided the funds because WOOD told Mr. Pirgmann that WOOD needed the funds as flash capital liquidity for the potential acquisition of a new asset unrelated to Plaintiffs.

45.     When WOOD did not timely repay the funds to Mr. Pirgmann, the Plaintiffs were prompted to generally investigate WOOD's management of the Plaintiffs' affairs.

46.     Upon investigation, Plaintiffs discovered that the status reports and annual statements provided by WOOD, with the assistance of GIES and others, were false.

47.     WOOD's representations to Blackport itself, and the Plaintiffs, regarding his conduct and the true status of the property interests, were false.

48.     The status reports and annual statements provided by WOOD misrepresented that certain assets were still held by Plaintiffs or otherwise accruing value to the benefit of Plaintiffs.

49.     In actuality, as detailed further below, WOOD fraudulently concealed that he had sold certain property interests for less than reasonably equivalent or fair market value to other Defendants and sold other property interests to third parties without authorization from or the knowledge of Plaintiffs; fraudulently conveyed, assigned, transferred, and liquidated property interests; and fraudulently concealed the proceeds from his activities.

50.     In so doing, WOOD often signed instruments that would transfer Plaintiffs' properties or mortgage interests improperly. WOOD never held a position directly in HPC Management, LLC; HPC Fund Management, LLC; HPC US 1; or HPC US 2. Thus, any instruments signed by WOOD as a manager, officer, director, or partner in any one of those entities is suspect.

51.     Under the current operating agreement, WOOD was the manager of Blackport from the agreement's effective date, January 2010, until his removal on or about August 7, 2013. He was removed immediately after the Plaintiffs discovered some of the fraudulent conduct described herein. *See* Exhibit "1."

52.     In the transactions described herein, WOOD exceeded the scope of his authority by conveying property interests for less than reasonably equivalent or fair market value, not accounting to Plaintiffs for conveyances of Plaintiffs' property interests, and conveying property interests without Plaintiffs knowledge or permission.

53.     Several of the properties in which Plaintiffs have interests are currently subject to a receivership. Wextrust Capital, LLC, a company with which HPC US 1 had entered into a partnership, has had a receiver appointed over it in a case currently pending in the Southern

District of New York: *SEC v. Byers*, Case No.: 08-cv-7104. Herein, that case will be referred to as the "Wextrust Receivership."

54.     After Plaintiffs began investigating WOOD's acts as the manager of Blackport and HPC Loan Servicer, LLC, Plaintiffs' representative contacted an attorney for the Wextrust Receiver on or about August 1, 2013.

55.     An attorney for the Receiver disclosed that several bank accounts held by the Plaintiffs, and their related entity, HPC Management, LLC, have been frozen. Several Blackport accounts were also frozen. According to an attorney for the Receiver, the balance of those accounts is de minimis or at zero balance.

56.     Plaintiffs do not know of any additional bank accounts held by Plaintiffs, their related entity, HPC Management, LLC; or by Blackport, into which WOOD could have deposited funds stemming from the transfers described herein.

57.     Thus, the Plaintiffs must conclude that WOOD has not provided the proceeds from the property and mortgage interests that he transferred or liquidated to the Plaintiffs, the rightful recipients of any such funds.

58.     Rather, WOOD retained the proceeds from the liquidations for his personal benefit, and is believed to have used a portion of the proceeds to pay his creditors, or has funneled the proceeds into entities owned or controlled by himself or by the other Defendants.

*The Properties at Issue Discovered Thus Far*

59.     Plaintiffs collectively have interests, either as mortgages or REOs, in approximately forty (40) properties in the United States, spanning roughly eighteen (18) different states.

60.     Plaintiffs are engaged in an ongoing investigation as to the status of the properties in which they have interests and anticipate needing to amend this complaint to allege additional

improper conveyances and other fraudulent activities undertaken by WOOD and/or other Defendants.

### The Alaska Property

61.    HPC US 2 has an interest in the "Alaska" property. *See* Exhibit "2."

62.    The Alaska property consists of a mobile home park located at 2208 Eureka Street, Anchorage, Alaska 99503.

63.    On or about April 12, 2013, WOOD attempted to convey the Alaska property without the knowledge or permission of HPC US 2. *See* Exhibit "3."

64.    The deed purported to convey the property to WELLESLEY.

65.    According to a draft deed retrieved from the Blackport office and signed by WOOD, WOOD expected to receive $51,000.00 in return for the deed to WELLESLEY, which is far below the approximate actual value of the property. *See* Exhibit "4."

66.    On or about May 14, 2013, WOOD signed a corrective special warranty deed conveying the property to WELLESLEY, which was recorded on May 22, 2013. *See* Exhibit "5."

67.    On the same day, May 22, 2013, a statutory warranty deed conveying the property from WELLESLEY to Holland's Holdings, LLC was recorded. That deed was signed by BURGESS on May 14, 2013. *See* Exhibit "6."

68.    BURGESS' signature was notarized by Keyla Sarduy, who worked as Blackport's secretary and/or assistant.

69.    According to documents retrieved from the Blackport office, there was originally an agreement for HPC US 2, and minority owners, to sell the property to Holland's Holdings, LLC for $1,050,000.00. *See* Exhibit "7."

70.    The Municipality of Anchorage lists the 2013 taxable value of the property as $884,600.00. *See* Exhibit "8."

71.     WELLESLEY's position is that WOOD agreed to sell a ninety percent interest in the mobile home park to WELLESLEY in exchange for the forgiveness of about $780,000.00 in debt from Blackport or WOOD to WELLESLEY. *See* D.E. 16, p. 6. and D.E. 16-2, p. 4.

72.     Plaintiffs contest the validity the alleged debt forgiveness as consideration for the conveyance.

73.     According to a wire transfer document from the title company involved, WELLESLEY received approximately $850,460.14 in return for the property. *See* Exhibit "9"; *see also* D.E. 16-7.

74.     Thus, the Alaska property was sold to WELLESLEY for less than fair market value.

75.     Without informing HPS US 2 that the property had already been sold to WELLESLEY, WOOD represented, on or about July 18, 2013, to representatives of HPC US 2 that as of July 15, 2013 the property was set for closing at a sale price of $1,050,000.00, implying that the proceeds of the sale would go to HPC US 2. *See* Exhibit "10," WOOD's email and status reports attached thereto.

76.     It is estimated that the interest in the Alaska property held by HPC US 2 was worth approximately $1.4 million.

77.     On financial statements for 2012, GIES put the value of the Alaska property, also called Nona Oma, as $1.374 million. *See* Exhibit "11."

**The Atlantic City Property**

78.     HPC US 1 has an ownership interest in a property known as the "Atlantic City" property, which consists of 109 & 111 S. Lincoln Place and 3525 & 3527 Boardwalk, Atlantic City, New Jersey, via the partnership with Wextrust. *See* Exhibit "12."

79.     This property is currently involved in the Wextrust Receivership.

80.     WOOD knew about the receivership and its connection to the Atlantic City property because in his May 2013 status report, WOOD represents that no marketing for the property will take place until the Wextrust litigation is complete. *See* Exhibit "13."

81.     On or about July 18, 2013, WOOD wrongfully held out to representatives of HPC US 1 that the Atlantic City property had not been sold. *See* Exhibit "10."

82.     On or about December 6, 2012, however, WOOD had executed a quitclaim deed, granting the property from Wextrust/HPC Mortgage Fund, L.P. to ATLANTIC CITY PROPERTIES, LLC. *See* Exhibit "14."

83.     The conveyance to Atlantic City Properties, LLC was improper for several reasons:

    a.     The property was subject to the receivership;

    b.     WOOD did not have permission or consent from HPC US 1 or Wextrust/HPC Mortgage Fund, L.P. to convey the property; and

    c.     Because HPC US 1's interest was subordinated to that of another creditor by the Superior Court of New Jersey on or about June 9, 2011 in Atlantic County, Case No.: C-73-09. *See* Exhibit "15."

    d.     Upon information and belief, neither Wextrust/HPC Mortgage Fund, L.P. nor HPC US 1 received any consideration for the conveyance.

84.     According to WOOD's status report, HPC US 1 had invested $1,312,500.00 in the property via its mortgage interest. *See* Exhibit "10."

85.     On financial records prepared "[a]s of December 31, 2012," GIES not only continued to represent that the Atlantic City property was an REO, but valued the asset at $1.377 million. *See* Exhibit "11."

86.     Upon information and belief, HPC US 1 has been ordered to deed the Atlantic City property to the superior creditor in Atlantic County, Case No.: C-73-09 and a related bench warrant has been issued for the arrest of WOOD. *See* Exhibit "16."

### The Trailgate Property

87.     HPC US 2 has an ownership interest in the property known as "Trailgate," an equestrian center located at 4517 96th Street East, Tacoma, Washington 98466. *See* Exhibit "17."

88.     On or about July 18, 2013, WOOD represented to representatives of HPC US 2 that the property remained in HPC US 2's portfolio. *See* Exhibit "10."

89.     Specifically, the status report emailed to Mr. Pirgmann and Mr. Andreas Brinke, as representatives of Plaintiffs, on or about July 18, 2013 states that as of July 15, 2013 there were title issues on the property for which a release was supposed to be forthcoming. *See* Exhibit "10."

90.     On or about May 7, 2012, however, WOOD signed a warranty deed conveying the property to third parties, Jeffrey and Vanessa Kuhlman. *See* Exhibit "18."

91.     As part of its investigation, HPC US 2 has been told by a third party that WOOD sold the property for $750,000.00.

92.     According to WOOD's status report, HPC US 2 invested roughly $1,080,000.00 in the property. *See* Exhibit "10."

93.     WOOD did not account to Plaintiffs for the sale of the Trailgate property, nor have Plaintiffs received any proceeds from the sale.

94.     The Pierce County tax records valued the three parcels composing the Trailgate property at approximately $716,600.00 for the 2012 tax year and $1,010,900.00 for the 2013 tax year. *See* Exhibit "19."

95.     Despite the property having been sold, GIES represented that the Trailgate property was an REO asset on financial documents prepared "[a]s of December 31, 2012" and valued the asset at $1.08 million. *See* Exhibit "11."

96.     HPC US 2 asserts an interest in any funds derived by the conveyance of the Trailgate property.

### The Ruston Property

97.     HPC US 1 has an ownership interest in a property known as the "Ruston" property, a split level commercial building located at 5046 N. Highland Street, Tacoma, Washington 98407. *See* Exhibit "20."

98.     On or about July 18, 2013, WOOD represented to HPC US 1 that the property remained in HPC US 1's portfolio. *See* Exhibit "10."

99.     Specifically, the status report emailed to Mr. Pirgmann and Mr. Andreas Brinke, as representatives of Plaintiffs, on or about July 18, 2013 states that as of July 15, 2013, the property was being marketed for sale at $399,000.00, implying that the proceeds of any such sale would go to HPC US 1. *See* Exhibit "10."

100.    On or about July 17, 2013, however, WOOD signed a deed conveying HPC US 1's interest in the property to WELLESLEY. *See* Exhibit "21."

101.    According to WELLESLEY, the consideration for the sale was $240,000.00. *See* D.E. 26, at p. 2.

102.    According to a purchase and sale contract provided by WELLESLEY, the consideration was actually $240,000.00 in debt forgiveness for debts allegedly owed to WELLESLEY by HPC US 1 and HPC US 2; WHYDAH; and Greensboro Hotel Holdings, LLC. *See* D.E. 16-4.

103.    Plaintiffs contest the validity of the consideration allegedly paid for the conveyance of the Ruston property; and in particular Plaintiffs liability for the debts of WHYDAH and other debts WELLESLEY may allege were owed by Plaintiffs or entities related to them.

104.    As of approximately October 13, 2013, www.wellesleyfunds.com states that the Ruston property was acquired for $240,000.00 and is valued at $499,000.00. *See* Exhibit "22."

105.    The Pierce County tax assessor lists the value of the Ruston property at $420,700.00 for the 2012 tax year and $272,600.00 for the 2013 tax year. *See* Exhibit "23."

106.    WOOD did not account to Plaintiffs for the sale of the Ruston property, nor have Plaintiffs received any proceeds from the sale.

107.    Plaintiffs had no knowledge of the sale until approximately August 1, 2013.

108.    According to Florida Department of State records, WOOD was a director of WELLESLEY at the time of the conveyance. *See* Exhibit "80."

109.    It thus appears that the Ruston property was sold to an insider and for less than fair market value.

### The Myra Jordan Property

110.    Both HPC US 1 and HPC US 2 have an ownership interest in a property known as the "Myra Jordan" property, a multi-family residential building located at 1424 L. Street SE, Washington, DC 20003, via the Wextrust/HPC partnership. *See* Exhibit "24."

111.    HPC US 2's interest in the property is involved in the Wextrust Receivership.

112.    On or about July 18, 2013, WOOD, via status report, represented to representatives of Plaintiffs that the property had not been sold and remained in Plaintiffs' portfolios. *See* Exhibit "10."

113.    The status report is false because WOOD had already sold the property despite the pending Wextrust receivership.

114.    On or about December 9, 2011, WOOD signed a deed conveying the property from Wextrust/HPC Mortgage Fund, L.P. to 1424 L Street, LLC in exchange for $800,000.00. *See* Exhibit "25."

115.    GIES knew about the sale of the Myra Jordan property, but nevertheless prepared or helped to prepare financial statements "[a]s of December 31, 2012" that list the property as an REO asset valued at $214,911.65. *See* Exhibit "11."

116.    WOOD did not account to Plaintiffs for the sale of the Myra Jordan property.

117.    Based on Plaintiffs' bank account balances and records obtained to date, it does not appear that Plaintiffs received any proceeds from the sale.

118.    According to counsel for the Wextrust Receiver, it appears that Wextrust also did not receive any proceeds from the sale.

**The Secret Lake Property**

119.    HPC US 1 has an ownership interest in a property known as the "Secret Lake" property, 11.44 acres of land located at Captain Kidd Blvd., Kissimmee, Florida 34747. *See* legal description of property attached hereto as Exhibit "26."

120.    HPC US 1's title to the Secret Lake property is derived as follows:

   a.    On or about January 4, 2002, Florida Vacation Ventures, LLC, executed a Warranty Deed in favor of First Credit Equities Corp., a copy of which is attached hereto as **Exhibit "27"** and incorporated hereto as fully set forth herein.  The Warranty Deed was recorded in the Official Records Book of Osceola County, Florida Book 1986 Page 0100 and incorporated by reference herein.

b.   On or about January 4, 2002, First Credit Equities Corp. executed and delivered a mortgage to First Credit Commercial Capital Corp.[1] in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00). A copy of the mortgage is attached hereto as **Exhibit "28"** and incorporated hereto as fully set forth herein. The Mortgage was recorded in the Official Records Book of Osceola County, Florida Book 1986 Page 0102 and incorporated by reference herein. As stated therein, the Mortgage matured on January 4, 2004.

c.   On or about May 13, 2010, First Credit Equities Corp. executed a Quitclaim Deed in favor of the HPC US 1, a copy of which is attached hereto as **Exhibit "29"** and incorporated hereto as fully set forth therein. The Quitclaim Deed was recorded in the Official Records of Osceola County, Florida at Book 3993 Page 2096 and incorporated by reference herein.

121.   On or about July 18, 2013, WOOD represented to representatives of HPC US 1 in a status report that HPC US 1 had invested $2,500,000.00 in the property and that the property had not been sold, but was listed for sale at $2.2 million as of June 15, 2013. *See* Exhibit "10."

122.   On or about May 10, 2013, however, WOOD had executed a quitclaim deed conveying the property to RITE TIMING. *See* Exhibit "30." A copy of the quitclaim deed to RITE TIMING was recorded in the Official Records of Osceola County, Florida at Book 4442 Page 1893 and incorporated by reference herein.

123.   WOOD did not account to Plaintiffs for the sale of the Secret Lake property, nor have Plaintiffs received any proceeds from the sale.

---

[1] According to the recorded mortgage and later satisfaction, Mr. Gary Lind Johnson is President of both First Credit Equities Corp. (borrower) and First Credit Commercial Capital Corp. (lender). According to the Florida Department of State the officers and directors of both entities are also identical.

124.    According to the document stamp on the deed conveying the Secret Lake property and section 201.01, Florida Statutes, the deed was given in consideration for approximately $395,000.00.

125.    According to the Osceola County tax assessor, the Secret Lake property is valued at approximately $1,234,500.00. *See* Exhibit "31."

126.    The deed is witnessed by DE LOS REYES and Michael Lally, and is also notarized by Mr. Lally.

127.    On or about October 11, 2013, a corrective deed was recorded purporting to correct the conveyance to RITE TIMING by changing the legal description and the capacity in which WOOD signed the deed. *See* Exhibit "32."

128.    This corrective deed is notarized on August 23, 2013, the day this Court entered a temporary restraining order over all Defendants. A copy of the temporary restraining order was emailed to Defendants DE LOS REYES and WOOD, among others, in the evening on August 23, 2013. Both DE LOS REYES and WOOD were also emailed the complaint and emergency motion for temporary restraining order on August 22, 2013.

129.    Also recorded at the same time on October 11, 2013, is an affidavit signed by WOOD attesting to the capacity in which he signed the corrective deed. *See* Exhibit "33."

130.    Despite having been removed as manager of Blackport on or about August 7, 2013 and having received notice of his removal via email on the same day, WOOD's affidavit, dated by the notary as August 23, 2013, states that WOOD is the manager of Blackport. *See* Exhibits "1" and "33."

131.    The notary for both the corrective deed and the affidavit was Michael Lally, whom appeared before this Court on September 3, 2013 as a corporate representative of at least

one of the DE LOS REYES entities: DE LOS REYES PROPERTIES; RITE TIMING; ATLANTIC CITY; or TRIBECA.

132.    Also recorded at the same time on October 11, 2013, is a satisfaction of mortgage, from a dissolved Florida corporation as mortgagee (for a mortgage initially recorded prior to the property being deeded to HPC US 1) and dated August 27, 2013. *See* Exhibit "34."

133.    Upon information and belief, the mortgage satisfied in Exhibit "34" had been paid off or otherwise satisfied prior to the deed to RITE TIMING.

134.    It appears the Secret Lake property was transferred for less than fair market value.

135.    Upon information or belief, RITE TIMING had actual or constructive knowledge that the Secret Lake property was transferred for less than fair market value, or was otherwise improperly transferred without HPC US 1's knowledge or permission.

136.    Accordingly, the quitclaim deed to RITE TIMING is a cloud on HPC US 1's title to the Secret Lake property.

137.    RITE TIMING and HPC US 1 have adverse interests in the Secret Lake property.

**The Commodore Plaza Property**

138.    The property located at 3162 Commodore Plaza, Miami, Florida 33133 is known as the "Commodore Plaza" property. A legal description of the property is attached hereto as Exhibit "35."

139.    HPC US 2 was the mortgagee of the property by that certain mortgage, the "Commodore Mortgage," Official Records of Miami-Dade County, Book 27239, Pages 2676-26881, with a principal amount of $1.2 million. *See* Exhibit "36."

140.    On or about July 18, 2013, WOOD represented to Plaintiffs that the total amount remaining on the loan payoff for HPC US 2's interest is $1,140,917.00 and that the total cash received to date was $59,957.00. *See* Exhibit "10."

141.    The status report also represented that an auction was set, which would lead to an REO interest in the property. *See* Exhibit "10."

142.    According to the Miami-Dade Clerk of Courts records, in an action brought by HPC US 2 for foreclosure of the property, no such auction date had been set. Rather, a sale date of July 22, 2013 was set for at least a portion of the property in an action brought by First Bank of Miami in which partial summary judgment was granted in favor of the bank and against HPC US 2. *See* Miami-Dade Official Records, Book 28593, Page 2272 and *HPC US Fund 2, L.P. v. WCG Real Estate Miami, Inc.*, 2010-42046-CA-01. *See* Composite Exhibit "37."

143.    On or about April 22, 2013, however, WOOD had assigned the mortgage to DE LOS REYES PROPERTIES, the "Commodore Assignment."  *See* Exhibit "38." The assignment is recorded in the Official Records of Miami-Dade County, Florida at Book 28594 Page 3224-3225.

144.    WOOD assigned the mortgage without HPC US 2's knowledge or permission, and did not account to HPC US 2 for any consideration received in exchange for the assignment of mortgage.

145.    On the financial statements prepared "[a]s of December 31, 2012" by GIES, the value of the Commodore Plaza property loan was $1 million. *See* Exhibit "11."

146.    Upon information and belief, the Commodore Assignment to DE LOS REYES PROPERTIES was not for fair market value.

147.    Upon information and belief, DE LOS REYES PROPERTIES had either actual or constructive knowledge or notice that the assignment of mortgage was for less than fair market value and/or without the knowledge or permission of Plaintiffs.

148.    On or about May 20, 2013, DE LOS REYES PROPERTIES recorded a partial release of the mortgage. *See* Exhibit "39." The partial release was recorded in the Official Records of Miami-Dade County, Florida Book 28656 Page 3230.

149.    Thus, it appears that DE LOS REYES PROPERTIES has received funds as a result of the assignment of the mortgage.

150.    HPC US 2 now asserts an interest in both the funds received from the partial release of the mortgage on the Commodore Plaza property and a mortgage interest in the property itself.

**The Jaramillo Apartments Properties**

151.    HPC US 2 had a mortgage interest over the properties known as the "Jaramillo Apartments" properties, located at 946 SW 4th Street, Miami, Florida 33130; 3125 NW 132 Terrace, Opa Locka, Florida 33054; and 1601 NW 62nd Street, Miami, Florida 33147.

152.    HPC US 2's mortgage interest is recorded in the Miami-Dade County Official Records at Book 27358, Page 3983, showing a balloon payment of $750,000.00 due to HPC US 2. *See* Exhibit "40."

153.    The 1601 NW 62nd Street, Miami, Florida 33147 property was added as additional collateral for the mortgage by a Cross-Collateralization Agreement, recorded in the Official Records of Miami-Dade County, Florida at Book 27358 Pages 4008-4021. *See* Exhibit "41." The Cross-Collateralization Agreement references a second mortgage in the amount of $500,000.00.

154.    On or about July 20, 2010, a UCC Financing Statement was recorded in the Official Records of Miami-Dade County at Book 27358, Page 4022.  A true and correct copy of the UCC Financing Statement is attached hereto as **Exhibit "42"**, and the Official Record of the UCC Financing Statement is herein incorporated by reference.

155.    On or about July 14, 2010, the property owners executed an Assignment of Rents, Leases, Profits, and Contracts in favor of HPC US 2. *See* Exhibit "44."

156.    On or about July 18, 2013, WOOD represented to HPC US 2 that it continued to hold a mortgage interest in the property and that a payoff may occur via sale of the property by the borrower. *See* Exhibit "10."

157.    Without the knowledge or permission of HPC US 2, on or about, October 18, 2011, WOOD executed a Satisfaction of Mortgage (the "October 2011 Satisfaction").  A copy of the October 2011 Satisfaction was recorded in the Official Records of Miami-Dade County, Florida at Book 27881 Pages 2236-2238.

158.    The October 2011 Satisfaction purports to satisfy the Assignment of Rents, the UCC Financing Statement, the Cross-Collateralization Agreement, and the security interest over the property located at 1601 NW 62nd Street, Miami, Florida 33147.

159.    Without the knowledge or permission of HPC US 2, on or about July 20, 2012, WOOD executed a Satisfaction of Mortgage (the "July 2012 Satisfaction").  A copy of the July 2012 Satisfaction was recorded in the Official Records of Miami-Dade County at Book 28173, Page 3440-3441.

160.    The July 2012 Satisfaction purports to satisfy the Assignment of Rents, the UCC Financing Statement, and a security interest over the property located at 946 SW 4th Street, Miami, Florida, 33135.

161.    The two satisfactions are attached hereto as Composite Exhibit "44."

162.    Despite the October 2011 and July 2012 satisfactions, GIES still valued the Jaramillo Apartments loan interest at $1.1 million on financial statements prepared "[a]s of December 31, 2012." *See* Exhibit "11."

163.    WOOD did not account to HPC US 2 for any mortgage payments supporting the satisfactions detailed herein for the Jaramillo Apartments properties.

164.    It appears that approximately $1.2 million was paid in relation to the Jaramillo Apartments mortgages: roughly $750,000 was paid to a bank account in HPC US 2's name for which WOOD had signatory authority, and the remaining amount was paid to a Blackport account that WOOD also had access to. Therefore, WOOD and GIES took efforts to conceal the payment of such monies from HPC US 2.

**The 56 Walker Property**

165.    HPC US 2 has a loan interest in the property known as the "56 Walker" property, a five story masonry loft building located at 56 Walker Street, New York, NY 10013. *See* Exhibit "45."

166.    HPC US 2's interest in the property is involved in the Wextrust Receivership.

167.    On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2, which did not disclose any assignments or other conveyances of HPC US 2's interest. Instead, the status report discussed a distinct suit with a superior interest holder. *See* Exhibit "10."

168.    WOOD has been representing to others that HPC US 2 had acquired some of the mechanics' liens encumbering the 56 Walker Property.

169.    In addition, several documents have been discovered purporting to constitute an assignment of mechanics' liens to HPC US 2. *See* Exhibit "46."

170.    On or about January 28, 2013, WOOD executed an assignment of mechanics liens, which apparently has not been recorded in New York, purporting to assign approximately $903,433.49 in mechanics liens to TRIBECA. *See* Exhibit "47."

**The Baxter Property**

171.   HPC US 2 has a loan interest in the property located at approximately 202 Norman Avenue, New York, NY 11222 known as the "Baxter" property.

172.   Specifically, HPC US 2 acquired a mortgage secured by the Baxter property via an assignment of mortgage dated on or about July 15, 2008 and recorded in the official records of New York. *See* Exhibit "48."

173.   On or about July 18, 2013, WOOD sent a status report to HPC US 2. The status report stated that HPC US 2 had a 90% ownership interest in the property and had invested $360,000.00 in the property. *See* Exhibit "10."

174.   On or about June 15, 2010, however, WOOD had signed an assignment of interest in mortgage, promissory note, and loan documents to Blackport. *See* Exhibit "49."

175.   Subsequently, Wood signed a satisfaction of the Baxter mortgage on behalf of both HPC US 2 and Blackport on or about March 28, 2012, which was recorded in the official records of New York. *See* Exhibit "50."

176.   Keyla Sarduy and GIES, who worked at the Blackport office, signed the satisfaction as witnesses.

177.   Despite signing the satisfaction as a witness, GIES continued to represent the Baxter property as a loan interest on financial statements dated "[a]s of December 31, 2012" and valued that interest at $360,095.40. *See* Exhibit 11."

178.   Elda Miranda, who at some point worked as Blackport's secretary, notarized the satisfaction.

179.   At an earlier time, Plaintiffs understood that Blackport was to receive a small mortgage interest in the property from a third party, but that interest was supposed to be in

addition to HPC US 2's interest. HPC US 2 was not supposed to assign any interest directly to Blackport.

180.    Regarding Blackport, Michael Pirgmann and Andre Hoffmann, the majority equity owners of Blackport at the time of the assignment, also had no knowledge of the assignment of the Baxter property and have no knowledge of monies being received by Blackport in payment of the mortgage. According to the Receiver, several Blackport bank accounts have been frozen at zero or de minimis balances. Neither Mr. Pirgmann, Mr. Hoffmann, nor Plaintiffs, are aware of any other Blackport bank accounts that have not been frozen in which the mortgage proceeds might be found.

181.    Given the balance of the Blackport accounts and Plaintiffs' accounts, Plaintiffs must conclude that HPC US 2 did not receive any funds as consideration for the assignment to Blackport or in consideration for the satisfaction of the mortgage.

**The Deerka Property**

182.    HPC US 2 has a loan interest in a property known as the "Deerka" property, composed of 29 two-story townhomes located in Fort Lauderdale, Florida.

183.    On or about June 24, 2009, a mortgage was executed by the borrower, Deerka Corporation, in favor of PAN AMERICAN in the amount of $1,000,000.00, the "Deerka Mortgage," which was recorded in the Official Records of Broward County, Florida Book 46332 Page 130. *See* Exhibit "51."

184.    On or about August 28, 2009, PAN AMERICAN executed an assignment of the mortgage to MAYER PARTNERSHIP, which was recorded in the Official Records of Broward County, Florida Book 46520 Page 711. *See* Exhibit "52."

185.    Again, on or about August 28, 2009, HPC US 2 received an assignment of mortgage from MAYER PARTNERSHIP for the Deerka property, which was recorded in the Official Records of Broward County, Florida Book 46520 Pages 714-717. *See* Exhibit "53."

186.    On or about September 15, 2009, a UCC Financing Statement Amendment Form was recorded in the Official Records of Broward County, Florida Book 46520 Page 720 stating that the mortgage had been assigned to HPC US 2. *See* Exhibit "54."

187.    On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2 stating that HPC US 2 had invested $750,000.00 in the property and that foreclosure was being pursued. *See* Exhibit "10."

188.    An earlier status report from approximately May 2013 states that the loan payoff amount is $750,000.00. *See* Exhibit "13."

189.    Several partial releases or satisfaction of mortgage were recorded from approximately October 2, 2009 to March 7, 2012. *See* Official Records of Broward County, Florida Book 48577 Page 725; Book 47915 Page 1088; Book 47771 Page 1805; Book 47473 Page 1443; Book 47350 Page 1405; Book 47176 Page 547; Book 47176 Page 492; Book 47075 Page 146; Book 47058 Page 563; Book 47058 Page 557; Book 46889 Page 708; Book 46801 Page 956; Book 46573 Page 273; Book 46672 Page 683; Book 46603 Page 699; attached hereto as Composite Exhibit "55."

190.    The partial releases/satisfactions state that PAN AMERICAN and MAYER PARTNERSHIP are the entities satisfying the mortgage.

191.    WOOD signed on behalf of PAN AMERICAN.

192.    MAYER signed on behalf of MAYER PARTNERSHIP.

193.    WOOD also signed the partial releases/satisfactions purportedly on behalf of HPC US 2.

194.     HPC US 2 did not have knowledge of the partial releases/satisfactions, nor did WOOD account to Plaintiffs for any monies received from the Deerka mortgage that would support a partial release/satisfaction.

195.     Rather, WOOD represented that foreclosure was being pursued, indicating that monies were still owed on the mortgage for the Deerka property.

196.     On or about March 8, 2012, the borrower, DEERKA CORP., executed and delivered a mortgage in favor of Viv Management Company in the amount of $750,000.00, which was recorded in the Official Records of Broward County, Florida Book 48566 Page 843. The mortgage to Viv Management Company has since been satisfied by Aviva Mayer, as President, with MAYER signing as a witness. *See* Exhibit "56."

197.     Also on or about March 12, 2012, an attorney filed a UCC Financing Statement Amendment Form stating that HPC US 2's interests as a secured party were terminated. *See* Composite Exhibit "57."

198.     HPC US 2 and its representatives and advisors did not authorize the termination of its status as a secured party.

199.     On March 12, 2012, the same day as the termination, the same attorney filed a UCC Financing Statement Form listing Viv Management Company as the secured party. *See* Composite Exhibit "57."

200.     Michael Pirgmann, advisor to HPC US 2, has recently spoken with the borrower on this loan and learned that the borrower believes its loan has been paid off to MAYER in or around January 2013 and that the last payment was of approximately $60,000.00.

201.     Based upon the satisfactions of mortgage and the statements of the borrower, PAN AMERICAN, MAYER, and MAYER PARTNERSHIP continued to collect on the Deerka

mortgage or otherwise receive monies stemming from the mortgage after the mortgage was assigned to HPC US 2.

202.    Despite HPC US 2's mortgage interest in the Deerka property purportedly being satisfied by March 2012, GIES continued to list the Deerka loan interest on the financial statements prepared "[a]s of December 31, 2012" and valued that interest at $750,000.00. *See* Exhibit "11."

### The Hilcrest Property

203.    HPC US 2 has a mortgage interest in the "Hilcrest" property, located at 220 5th Avenue North, St. Petersburg, Florida 33701.

204.    Specifically, on or about May 29, 2008, HILCREST RESIDENTIAL executed a mortgage granting HPC US 2 a security interest in the Hilcrest property, the "Hilcrest Mortgage," which is recorded in the Official Records of Pinellas County, Florida Book 16268 Page 2345. *See* Exhibit "58."

205.    Pursuant to the Hilcrest mortgage, HPC US 2 was granted a 560000/800000 undivided interest in the Hilcrest property. *See* Exhibit "58."

206.    No satisfaction of mortgage has been recorded in the Official Records of Pinellas County, Florida for this property.

207.    On or about May 16, 2008, HILCREST RESIDENTIAL executed an assignment of leases, rents, issues, and profits in favor of HPC US 2, which was recorded in the Official Records of Pinellas County, Florida Book 16268 Page 2366. *See* Exhibit "59."

208.    On or about May 29, 2013, PLEASANT ALTERNATIVE successor in interest to HILCREST RESIDENTIAL, conveyed the Hilcrest property to GASTON MHP via warranty deed for $340,000.00, which is recorded in the Official Records of Pinellas County, Florida Book 18033 Page 645. *See* Exhibit "60."

209.    As part of their investigation, Plaintiff received a copy of a letter sent by WOOD on or about May 22, 2013, making a one-time offer to satisfy the Hilcrest mortgage for $290,000.00, even though the payoff amount was $800,000.00. *See* Exhibit "61."

210.    An outgoing wire transfer form showed that $290,000.00 was sent on or about May 30, 2013 to the Weiss Law Group Trust Account to be held for "Blackport Investment Group." *See* Exhibit "61."

211.    Upon information and belief, the purported satisfaction, for which there is no recorded document, of the Hilcrest property was made for less than fair market value.

212.    It appears that the wire transfer was initiated as part of the closing for the conveyance to GASTON MHP, and as such it is unclear whether the purported satisfaction of the Hilcrest mortgage was made by HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE or GASTON MHP.

213.    On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2 stating that HPC US 2 had invested $560,000.00 in the property and that a short sale/note sale option was being pursued. *See* Exhibit "10."

214.    At the time of the status report, WOOD had already sent the letter offering to satisfy the mortgage and $290,000.00 had already been sent to the Weiss Law Group Trust Account.

215.    HPC US 2 did not give WOOD permission to offer or accept a reduced amount in satisfaction of the Hilcrest mortgage.

216.    Based on the de minimis or zero balance of Plaintiffs' bank accounts and other documents relating to the satisfaction of the Hilcrest mortgage, HPC US 2 did not receive any monies from the satisfaction of the Hilcrest mortgage.

217.   Rather, GIES received roughly $75,690.00 from funds related to the purported satisfaction of mortgage for the Hilcrest property.

**The Kenosha Property**

218.   HPC US 2 has an interest in the "Kenosha" property, located at 2213 N. Martin Luther King Jr. Drive, Milwaukee, Wisconsin 53210.

219.   Specifically, HPC US 2 had an interest via a participation agreement providing that in the event of foreclosure, the participator, Hallock Ryno Investments, Inc. was to take title to the property as the servicing agent of HPC US 2; and a subsequent sheriff's deed to Hallock Ryno Investments, Inc. *See* Exhibit "62."

220.   On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2 stating that HPC US 2 had invested $643,500.00 in the property (also called Soche) and that there was no new update after a tax foreclosure was served with a June 26th deadline. *See* Exhibit "10."

221.   The status report implied that the Kenosha property remained in HPC US 2's portfolio.

222.   On or about August 12, 2011, however, WOOD signed a deed transferring the property by quitclaim deed to 2213 Properties, Inc. *See* Exhibit "64."

223.   Also on or about August 12, 2011, 2213 Properties, Inc. executed a mortgage in favor of HPC Loan Servicer, LLC. *See* Exhibit "65."

224.   Then on or about August 16, 2013, the Kenosha property was lost to the City of Milwaukee for failure to pay property taxes after WOOD failed to timely pay the property taxes owed after being noticed of the pending tax foreclosure action. *See* Exhibit "66."

225.   According to the mortgage, Lonn Stengel is the president of 2213 Properties, Inc. *See* Exhibit "65."

226.    HPC US 2 has been unsuccessful in determining who or what entity holds an ownership interest in 2213 Properties, Inc.

227.    Lonn Stengel worked at the Blackport office .

228.    Lonn Stengel and BURGESS witnessed the deed to 2213 Properties, Inc. *See* Exhibit "64."

229.    BURGESS also witnessed the mortgage. *See* Exhibit "65."

230.    BURGESS must have known that Lonn Stengel, who was also President of 2213 Properties, Inc., could not serve as a legitimate witness to the deed conveying the property to 2213 Properties, Inc.

231.    Based on the balance of Plaintiffs' bank accounts, Plaintiffs did not receive any monies in return for the deed to 2213 Properties, Inc. nor in repayment for the mortgage given by HPC Loan Servicer, LLC.

232.    Upon information and belief, the transfer to 2213 Properties, Inc. was for less than fair market value.

233.    Plaintiffs had no knowledge that the Kenosha property was no longer in the name of HPC US 2, that a mortgage had been put on the property in favor of HPC Loan Servicer, LLC, or that the property had been lost to the City of Milwaukee for failure to pay property taxes until after Plaintiffs' commenced this suit.

234.    Rather, despite the property being transferred, the financial statements prepared "[a]s of December 31, 2012" by GIES continued to list the property as an REO valued at $688,233.80. *See* Exhibit "11."

### The Arbor Vitae/Sharp Property

235.    HPC US 2 has an interest in the "Arbor Vitae/Sharp" property, located at 10890 E. State Road 70, Woodruff, Wisconsin 54568, via a participation agreement providing that in

the event of foreclosure, the participator, PAN AMERICAN, is to take title to the property as the servicing agent of HPC US 2; and a subsequent sheriff's deed to PAN AMERICAN. *See* Exhibit "67."

236.     On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2 stating that HPC US 2 had invested $186,300.00 in the property, that as of June 15, 2013, a $150,000.00 offer was being negotiated, and otherwise implying that the property was in HPC US 2's portfolio. *See* Exhibit "10."

237.     Instead, on or about July 3, 2012, WOOD, signing as member of PAN AMERICAN, conveyed the property to third party, Lynn Mehrholz. *See* Exhibit "68."

238.     According to the Vilas County Register of Deeds, the consideration paid for the transfer was $120,000.00 based on the calculation yielding the transfer fee of $360.00 as shown on the deed.

239.     According to Vilas County tax data, the fair market value of the Arbor Vitae/Sharp property in 2012 was $207,365.00. *See* Exhibit "69."

240.     Despite the Arbor Vitae property being sold, GIES listed the property as an REO asset on the financial statement prepared "[a]s of December 31, 2012" and valued the property at $186,300.00. *See* Exhibit "11."

241.     Thus, the conveyance was for less than fair market value.

242.     Based on the balance of Plaintiffs' bank accounts, Plaintiffs have not received any proceeds from the sale.

**The Schwantes Properties**

243.     HPC US 2 has an interest in the "Schwantes" properties, located at 217 N. Washington Street, Green Bay, Wisconsin 54301 and 227 E. Walnut Street, Green Bay,

Wisconsin 54301; among other addresses that are not currently subjects of this complaint. *See* Exhibit "70."

244.    HPC US 2 entered into a participation agreement with Hallock Ryno Investments, Inc. pursuant to which HPC US 2 funded the majority of a mortgage on the Schwantes properties. After foreclosure of that mortgage, the sheriff's deed purports to convey the property to HPC Loan Servicer. *See* Exhibit "70."

245.    Plaintiffs believe that HPC Loan Servicer should be in their control via the member, HPC Management, LLC.

246.    Based on corporate filings in other states, it appears that WOOD might have been representing to third parties that either Blackport or himself owned and/or controlled HPC Loan Servicer, LLC. *See* Exhibit "63."

247.    On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 2 stating that HPC US 2 had invested $1,500,000.00 in the Schwantes properties, mentioning negotiations with the City of Green Bay, and otherwise implying that the properties were in HPC US 2's portfolio. *See* Exhibit "10."

248.    Contrary to WOOD's status report, the two Schwantes properties specifically identified above were conveyed from HPC Loan Servicer, LLC, which Plaintiffs believed they indirectly owned and controlled, to third parties.

249.    The 227 E. Walnut Street property was conveyed on or about May 30, 2013 by WOOD signing on behalf of HPC Loan Servicer, LLC to the Redevelopment Authority of the City of Green Bay. *See* Exhibit "71."

250.    The 227 E. Walnut Street property is unofficially valued at $225,800.00 according to Brown County, Wisconsin records. *See* Exhibit "72."

251. The 217 N. Washington Street property was conveyed on or about May 2, 2012 by WOOD signing on behalf of HPC Loan Servicer, LLC to DuPont Investments, LLC. *See* Exhibit "73."

252. The 217 N. Washington Street property is unofficially valued at $296,600.00 according to Brown County, Wisconsin records. *See* Exhibit "74."

253. WOOD never accounted to Plaintiffs for the conveyances.

254. The Schwantes properties were conveyed without HPC US 2's knowledge or permission.

255. GIES knew that at least one of the Schwantes properties had sold.

256. On the financial statements prepared by GIES "[a]s of December 31, 2012," the Schwantes properties collectively appear as an REO valued at $1.5 million. *See* Exhibit "11."

**The DI Greensboro Property**

257. HPC US 1 has an interest in the "DI Greensboro" property, located at 110 Seneca Road, Greensboro, North Carolina 27406.

258. On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 1 stating that HPC US 1 had invested $2,160,000.00 in the DI Greensboro property, mentioning operational concerns, and otherwise failing to mention any outstanding mortgages on the property. *See* Exhibit "10."

259. The property was held on behalf of HPC US 1 by a special purpose vehicle, Greensboro Hotel Holdings, LLC.  *See* Exhibit "75."

260. On or about August 3, 2012, WOOD signed a deed of trust in favor of Clifford Oliver, which was recorded, and encumbers the DI Greensboro property as security for a loan in the amount of $300,000.00. *See* Exhibit "76."

261.    The terms of the deed of trust required repayment by August 2, 2013. *See* Exhibit "76."

262.    WOOD signed the deed of trust purportedly on behalf of Greensboro Hotel Holdings, LLC, with HPC US 1 as its ultimate principal, and individually as a guarantor.

263.    WOOD did not account to HPC US 1 for any monies received in exchange or consideration for the deed of trust over the property.

264.    HPC US 1 did not have knowledge of or agree to the deed of trust or any related obligation of payment for the DI Greensboro property.

265.    It appears from the official records of Guilford County that the deed of trust remains an encumbrance on the DI Greensboro property.

266.    HPC US 1 has also recently learned that Clifford Oliver, the mortgagee, has filed suit to foreclose on the deed of trust that WOOD signed and that the City has filed a complaint relating to unpaid room taxes during the time WOOD was responsible for managing the property.

267.    The financial statements prepared by GIES "[a]s of December 31, 2012," do not reflect the mortgage over DI Greensboro as a liability, but do reflect DI Greensboro as an asset valued at $2.16 million. *See* Exhibit "11."

**The Five Star Property**

268.    HPC US 1 has an interest in the "Five Star" property located at 2750 Springport Road, Jackson, Michigan 49201.

269.    On or about July 18, 2013, WOOD sent a status report to representatives of HPC US 1 stating that HPC US 1 had invested $1,462,500.00 in the Five Star property, mentioning the recent payment of taxes for one of the parcels, discussing marketing attempts, and otherwise indicating that the property was still held by HPC US 1. *See* Exhibit "10."

270.   The Wextrust receivership affects this property.

271.   The Five Star property was originally owned by Wexford/HPC Mortgage Fund, L.P., in which HPC US 1 is a partner, via a May 28, 2008 Sheriff's deed on mortgage sale. *See* Exhibit "77."

272.   On or about March 1, 2011, one of the parcels was forfeited for non-payment of real estate taxes. *See* Exhibit "78."

273.   That parcel was later deeded to third party, Alex Perlos II, by the Jackson County Treasurer on or about August 30, 2012. *See* Exhibit "79."

274.   Thus, WOOD's representation that the property was still in HPC US 1's portfolio was false.

275.   According to the Jackson County tax records, the parcel was valued at $124,542.00 in 2011. *See* Exhibit "80."

276.   According to the financial statements prepared by GIES "[a]s of December 31, 2012," the Five Star properties are collectively valued at $1.458 million. *See* Exhibit "11."

*Relationships Among the Defendants*

277.   WOOD has a connection to all of the other Defendants. The connections between and among WOOD and the other Defendants are generally as follows, and detailed further below, based on Plaintiffs investigation so far:

a.   WHYDAH is WOOD's alter ego.

b.   PAN AMERICAN is connected to MAYER, MAYER PARTNERSHIP, WOOD, WELLESLEY, BRETON, and BURGESS.

c.   DE LOS REYES, and his entities, are connected to WOOD.

d.   GIES is connected to, at least, WELLESLEY and WOOD.

278.     According to the Florida Department of State, Division of Corporations, WOOD is the president, incorporator, sole director, and registered agent of WHYDAH. *See* Composite Exhibit "81."

279.     According to promissory notes recovered from the Blackport office, WHYDAH has issued notes promising to repay the sum of money it borrowed in full within roughly two weeks of the date of the note at an interest rate of twenty percent (20%). WOOD signed the notes.

280.     The listed address for WHYDAH is 901 SE 17th Street, Suite 206, Fort Lauderdale, Florida 33316, the same address as Blackport and an address previously used for HPC US 1 and HPC US 2. *See* Composite Exhibit "81."

281.     According to check stubs recovered from the Blackport office, checks have been written from WHYDAH accounts to WOOD multiple times in 2011 and 2013. *See* Composite Exhibit "82."

282.     Until July 19, 2012, WOOD was listed with the Florida Department of State, Division of Corporations as a manager and registered agent of PAN AMERICAN. *See* Composite Exhibit "83."

283.     The listed address for PAN AMERICAN is 901 SE 17th Street, Suite 205, Fort Lauderdale, Florida 33316, one suite over from the Blackport office. *See* Exhibit "84."

284.     HPC US 2 received its interest in the Deerka property via an assignment of mortgage from MAYER PARTNERSHIP on or about August 28, 2009, the same day PAN AMERICAN assigned the mortgage to MAYER PARTNERSHIP. *See* Exhibits "52" and "53."

285.     The assignment to HPC US 2, recorded in the Broward County Official Records, Book 46520, Page 717, is signed by MAYER as general partner of the MAYER PARTNERSHIP. *See* Exhibit "53."

286.   On a prior June 29, 2009 UCC Financing Statement Form listing PAN AMERICAN as the secured party, WOOD is listed as the contact person. *See* Composite Exhibit "57"

287.   Some of the WHYDAH check stubs show payments to PAN AMERICAN totaling roughly $91,650.00 over a one year period beginning in February 2011. *See* Exhibit "85."

288.   Until August 1, 2013, WELLESLEY was listed with the Florida Department of State, Division of Corporations as a manager member of PAN AMERICAN. *See* Exhibit "86."

289.   At present, for all intents and purposes PAN AMERICAN has been abandoned by its managers and members. The Florida Department of State records indicate a formal separation of all managers and members of record and an administrative dissolution of the entity as of September 27, 2013.

290.   BRETON and BURGESS, principals of WELLESLEY, previously worked out of the same office space as that used by Blackport.

291.   The same address was used for WELLESLEY up until as recently as September 13, 2012, when the address switched to suite number 205, the same address as PAN AMERICAN. *See* Composite Exhibit "87."

292.   As of January 15, 2013, WELLESLEY has the following address listed with the Florida Department of State, Division of Corporations: 305 S Andrews Ave, Suite 203, Fort Lauderdale, Florida 33301. *See* Composite Exhibit "87."

293.   The Plaintiffs have now discovered that BRETON has previously been sanctioned by the Securities Exchange Commission for violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Rules 13a-14 and 13b2-1 of the Exchange Act. *See* Exhibit "88."

294.    WOOD, WELLESLEY (as f/k/a PAN AMERICAN), BURGESS, and MAYER were also being sued in the Eastern District of New York. The plaintiffs in that case allege a Ponzi scheme and bring causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. *See Yovel-Bash, et. al. v. Wood, et. al.*, Case No.: 1:12-cv-05280-JMA (hereinafter the "Yovel-Bash Ponzi scheme case").

295.    An order was entered in the Yovel-Bash Ponzi scheme case granting a motion to transfer the case to the Southern District of Florida on September 5, 2013, and the case has now been transferred. *See Yovel-Bash, et. al. v. Wood, et. al.*, Case No.: 1:12-cv-05280-JMA (E.D.N.Y.), at D.E. 28 and *Yovel-Bash, et. al. v. Wood, et. al.*, Case No.: 1:13-cv-62410-PAS (S.D. Fla.).

296.    According to WOOD's affidavit filed in the Yovel-Bash Ponzi scheme case, WELLESLEY was formed by WOOD and BURGESS, and purchased an ownership interest in PAN AMERICAN. *See* Exhibit "89."

297.    In that same affidavit, dated April 12, 2013, WOOD states that he holds the role of "Class A management position" with PAN AMERICAN. *See* Exhibit "89."

298.    In addition to the Yovel-Bash Ponzi scheme case, there has been a Securities and Exchange Commission investigation of PAN AMERICAN, which apparently ended in a failure to recommend that an enforcement action be taken by the SEC. *See* Exhibit "89."

299.    As recently as December 22, 2011, WOOD used a Blackport employee, Keyla Sarduy, to direct communications with the plaintiff in the Yovel-Bash Ponzi scheme case. *See* Exhibit "90."

300.    According to an affidavit filed by the Yovel-Bash Ponzi scheme plaintiff, WOOD was involved with PAN AMERICAN since 2003, signing promissory notes ranging from that date to 2012. *See* Exhibit "91."

301.   According to the same affidavit, BURGESS sent an email on April 10, 2012 stating that WOOD personally and/or WELLESLEY had been funding PAN AMERICAN's interest payments.  *See* Exhibit "91."

302.   The affidavit then alleges that BURGESS' statements regarding PAN AMERICAN's "cash flow" issues are belied by an online statement discussing the business' prosperity and stating that WELLESLEY acquired ownership and control over PAN AMERICAN in the fall of 2011. *See* Exhibit "91."

303.   A Linkedin profile for BURGESS states that he is a fund manager at PAN AMERICAN. *See* Exhibit "92."

304.   According to check stubs recovered from the Blackport office, PAN AMERICAN paid at least $1,500.00 to WELLESLEY in 2011. *See* Exhibit "93," at check no. 1029.

305.   The same check stubs also show payments to WHYDAH ($3,000), BURGESS ($200) and WOOD ($2000) in 2011. *See* Exhibit "93," at check no. 1006; check no. 1044; and check no. 1007, respectively.

306.   Check stubs for WHYDAH show some payments to WELLESLEY, BRETON, and BURGESS in early 2012. *See* Exhibit "94," at check no. 1828; check no. 1935; and check no. 1939, respectively.

307.   As of August 13, 2013, the website, www.wellesleyfunds.com, indicates that BURGESS and BRETON are officers of the "Wellesley Fund" team.  *See* Exhibit "95."

308.   Several of the properties listed as completed projects on www.wellesleyfunds.com as of August 13, 2013 are properties that WOOD represented to Plaintiffs were part of Plaintiffs' REO and loan interest portfolios and that Plaintiffs assert an interest in. Specifically, the following properties discussed in this complaint were also visible on

www.wellesleyfunds.com as completed projects: Atlantic City, DI Greensboro, and Jaramillo Apartments.

309.    On or before August 30, 2013, the completed projects page of www.wellesleyfunds.com was taken down.

310.    Shortly thereafter, the entirety of www.wellesleyfunds.com was taken down for a period of time.

311.    On or before October 6, 2013, a "maintenance mode" notification appeared at www.wellesleyfunds.com.

312.    Between approximately October 6 and October 13, 2013, a modified site and list of completed projects now appears at www.wellesleyfunds.com, which now includes two properties featured in this complaint, the Alaska and Ruston properties. *See* Exhibit "96."

313.    GIES was listed as VP/T of WELLESLEY in reports filed with the Florida Department of State as recently as September 13, 2012. *See* Exhibit "97."

314.    According to check stubs recovered from the Blackport office, WELLESLEY paid Blackport Property Management Division, a fictitious name registered by WHYDAH, approximately $14,550.00 in March of 2012. *See* Exhibit "98," at check no. 1002.

315.    Check stubs for a WHYDAH account from the same address, show WELLESLEY being paid approximately $17,000.00 in 2011 and $10,000.00 in April 2013. *See* Exhibit "94," at  collectively (check no. 1522; check no. 1631; check no. 1644; check no. 1730) and check no. 2255, respectively.

316.    DE LOS REYES signed the deed for the sale of the Secret Lake property as a witness. *See* Exhibit "30."

317.    The Secret Lake property was sold to RITE TIMING, the president of which was Tim Suazo at the time this action was commenced according to the Florida Department of State. *See* Exhibit "99."

318.    Tim Suazo is also the registered agent for DE LOS REYES PROPERTIES. *See* Exhibit "100."

319.    On or about August 26, 2013, just after this lawsuit was filed, the Florida Department of State records were updated to show DE LOS REYES as president and to remove Tim Suazo as president, effective May 10, 2013, approximately the same date as RITE TIMING's incorporation. *See* Exhibit "101."

320.    Thus, according to the updated filings with the Florida Department of State, DE LOS REYES witnessed the deed conveying the Secret Lake property to a company of which DE LOS REYES was the president.

321.    DE LOS REYES is the manager member of DE LOS REYES PROPERTIES. *See* Exhibit "100."

322.    DE LOS REYES is also manager of TRIBECA, the company to which WOOD executed a purported assignment of HPC US 2's interest in several mechanic's liens regarding the 56 Walker property. *See* Exhibit "102."

323.    The assignment regarding the 56 Walker property lists the principal place of business of TRIBECA as the same address as the Blackport office. *See* Exhibit "47."

324.    DE LOS REYES is also the manager of ATLANTIC CITY PROPERTIES according to the Florida Department of State, Division of Corporations. *See* Exhibit "103."

325.    Mr. Pirgmann was told by DE LOS REYES that WOOD owed him $1 million.

326.    It appears that DE LOS REYES and/or one of the entities controlled by DE LOS REYES were involved in the potential acquisition related to the $500,000.00 that Mr. Pirgmann

provided to WOOD, which was not returned and prompted Plaintiffs' investigation of their property interests.

327.    According to check stubs recovered from the Blackport office, an account titled Blackport Investment Group, LLC d/b/a HPC Loan Servicer issued a check to DE LOS REYES for approximately $19,798.31 in December 2012. *See* Exhibit "104," at check no. 1497.

328.    Other check stubs for Blackport d/b/a HPC Loan Servicer show approximately $38,000.00 being paid to WOOD in 2011. *See* Exhibit "104."

329.    Check stubs from the same address for WHYDAH accounts show DE LOS REYES PROPERTIES being paid $19,500.00 in May 2013. *See* Exhibit "94," at check no. 2298.

330.    Likewise, a WHYDAH check stub shows DE LOS REYES PROPERTIES being paid $244,687.57 in March 2013 and $10,000.00 in April 2013. *See* Exhibit "94," at check no. 2239 and check no. 2259, respectively.

331.    Another WHYDAH check stub shows DE LOS REYES PROPERTIES being paid $585,000.00 for "payoff Kissimee post-dated" dated June 14, 2013. *See* Exhibit "94," at check no. 2300.

332.    The only property interest belonging to Plaintiffs located in Kissimmee is Secret Lake, which was sold to RITE TIMING on approximately May 10, 2013. *See* Exhibit "30."

333.    Other WHYDAH check stubs state that they were "handed to" DE LOS REYES. *See* Exhibit "94," at check no. 1177 and check no. 2290.

334.    DE LOS REYES testified at the September 3, 2013 preliminary injunction hearing in this action that he paid monies for the property interests he acquired to Special Purpose Acquisition Fund.

335.    According to the Florida Department of State, Division of Corporations, Special Purpose Acquisition Fund, Inc. is a now inactive company, of which WOOD is the director. *See* Exhibit "105."

336.    Plaintiffs have no interest in Special Purpose Acquisition Fund, Inc.

337.    According to the Florida Department of State, Division of Corporations, Aviva Mayer is the president and director of Viv Management Company, the company that was listed as secured party on the UCC Financing Statement Form for the Deerka property on the same day that HPC US 2 was removed, without its authorization or knowledge. *See* Exhibit "106."

338.    Aviva Mayer is the sister of MAYER according to the Affidavit of Ruth Yovel-Bash filed in the Yovel-Bash Ponzi scheme case. *See* Exhibit "91."

339.    MAYER is listed as a defendant in the Yovel-Bash Ponzi scheme case.

340.    According to the Florida Department of State, Division of Corporations, MAYER was also a manager member of PAN AMERICAN until June 10, 2011. *See* Exhibit "107."

341.    Thus, MAYER was a manager member of PAN AMERICAN at the time at least some of the satisfactions of mortgage executed by both PAN AMERICAN and MAYER PARTNERSHIP were recorded.

342.    Check stubs from the Blackport office for an account titled "HPC Loan Servicer" show the following payments to the Defendants:

a)    WELLESLEY – March 2011 - $3,500.00 – description: short term loan. *See* Exhibit "108," at check no. 1430.

b)    WELLESLEY – August 2011 - $337.20 – description: travel expenses for DI Greensboro (a HPC US 1 property previously appearing on the WELLESLEY website) for "PMB" (BURGESS' initials). *See* Exhibit "108," at check no. 1078.

   c)  WHYDAH – March 2012 - $4,500.00. *See* Exhibit "108," at check no. 1345.

   d)  WHYDAH – April 2010 - $7,500.00 and $20,000.00. *See* Exhibit "108," at check no. 1078 and check no. 1083, respectively.

   e)  PAN AMERICAN – February 2012 - $1,000.00 and $3,000.00. *See* Exhibit "108," at check no. 1291 and check no. 1313.

   f)  PAN AMERICAN – April 2012 - $1,700.00. *See* Exhibit "108," at check no. 1403.

343.    GIES has also received funds from multiple accounts related to Plaintiffs property interests. Some of the check stubs with GIES' name, which GIES characterizes as loan repayments, are attached hereto as Exhibit "109."

344.    As Plaintiffs continue to investigate, additional payment information will likely be uncovered regarding monies flowing among the Defendants, which may necessitate amendments to the complaint.

345.    Both WELLESLEY and DE LOS REYES have inside information regarding Plaintiffs because both entered into negotiations to purchase the Plaintiffs, as part of their parent company. WOOD brought both potential buyers to Plaintiffs. WELLESLEY's negotiations occurred from roughly early to mid 2012 and DE LOS REYES' negotiations took place from approximately the end of 2012 through mid 2013.

346.    Apparently, WOOD was conveying properties to both DE LOS REYES and WELLESLEY around the same time as the acquisition talks, and in the case of WELLESLEY, even after negotiations had ended.

## <u>COUNT I – VIOLATION OF 18 U.S.C. § 1962(c) – CIVIL RICO</u>

347.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

348.     This Count is against Defendants WOOD, WHYDAH, GIES, WELLESLEY, BURGESS, and BRETON (the "RICO Defendants").

349.     The RICO Defendants each meet the definition of a "person" as defined in 18 U.S.C. § 1961(3).

350.     The RICO Defendants collectively make up an associated in fact enterprise pursuant to 18 U.S.C. § 1961(4).

351.     The enterprise is an association in fact enterprise because, based on the evidence thus uncovered and attached hereto, the RICO Defendants have come together for the purpose of engaging in the complained of conduct alleged herein.

   a.     The RICO Defendants have the common purpose of engaging in fraudulent investment schemes based upon real property ownership and loan interests.

   b.     Specifically, the RICO Defendants have associated together for the purpose of engaging in a course of conduct that includes defrauding Plaintiffs by transferring Plaintiffs' real property interests without the knowledge or permission of Plaintiffs and without accounting for the proceeds to Plaintiffs.

   c.     The RICO Defendants in particular have intentionally participated in a scheme to deprive Plaintiffs of money and/or property, used the mails and/or wires in the furtherance of that scheme, and Plaintiffs relied to their detriment on the RICO Defendants' misrepresentations.

d.   The RICO Defendants have come together to function as a continuing unit with regard to perpetrating the alleged fraudulent activity via mail and/or wire fraud.

e.   The RICO Defendants and the enterprise are separate and distinct. Each of the RICO Defendants are free to act independently of each other and to advance their own separate interests.

352.   The RICO Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

353.   The RICO Defendants committed more than two predicate acts within a ten-year time span because they have committed violations of 19 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) numerous times since at least 2011. Specifically:

a.   The RICO Defendants did transmit or cause to be transmitted by wire, communications in interstate commerce, including writings or sounds for the purpose of executing the above referenced scheme to defraud, in violation of 18 U.S.C. § 1343, which prohibits fraud by wire.

b.   In addition, the RICO Defendants, for the purpose of executing or attempting to execute the scheme to defraud, did place, or cause to be placed in an authorized depository, a matter or thing to be sent or delivered by the Postal Service or by a private or commercial carries. These acts constitute criminal violations of the United States laws prohibiting mail fraud as set out in 18 U.S.C. § 1341.

c.     Specifically, the RICO Defendants sent or caused to be sent emails, status reports, deeds, assignments, and other documents related to the fraudulent transfer of Plaintiffs' property interests outside the State of Florida as alleged herein and attached hereto as exhibits, via either mail or wire.

d.     The RICO Defendants' use of the mails and wires allowed them to effect the scheme of concealing fraudulent transfers of Plaintiffs' properties from Plaintiffs, placing the properties in the hands of entities owned or controlled by the enterprise, and marketing those properties to other potential investors.

e.     The activities detailed herein affect interstate and foreign commerce.

f.     Predicate Act # 1

1)     On or about July 18, 2013, WOOD emailed the Plaintiffs (via their representatives) status reports discussing Plaintiffs' real estate and mortgage interests. *See* Exhibit "10."

2)     The status report falsely represented to Plaintiffs that certain properties and mortgage interests remained a part of Plaintiffs' portfolios.

3)     In reality, Plaintiffs' interests had been conveyed, transferred, or otherwise fraudulently removed from Plaintiffs' ownership or control on or about the following dates: Alaska (April 12, 2013); Atlantic City (December 6, 2012); Trailgate (May 7, 2012); Ruston (July 17, 2013);

Myra Jordan (December 9, 2011); Secret Lake (May 10, 2013); Commodore Plaza (April 22, 2013); Jaramillo Apartments (November 2, 2011 and July 3, 2012); Baxter (June 15, 2010); Deerka (approximately October 2, 2009 through March 7, 2012); Hilcrest (approximately May 22, 2013); Kenosha (approximately August 12, 2011); Arbor Vitae/Sharp (July 3, 2012); and Schwantes (approximately May 2, 2012 and May 30, 2013).

4) WOOD sent his email/status report to representatives of Plaintiffs, Mr. Pirgmann and Mr. Brinke, that WOOD knew or should have known were located in Germany.

5) WOOD intended to defraud Plaintiffs by sending false status reports.

6) Plaintiffs' reliance on the false status reports gave WOOD and the other RICO Defendants, additional time to wrongfully convey or assign other interests belonging to Plaintiffs and protected the RICO Defendants from Plaintiffs' discovery of the conveyances and assignments that had already taken place.

7) WOOD has previously emailed status reports to email addresses located outside of the United States on numerous occasions since early 2010.

8) The misrepresentations made to Plaintiffs would have been relied upon by a reasonable person.

g.      Predicate Act # 2

1)  On or about October 17, 2011, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "110."

2)  The report represented to HPC US 2 that its ownership interest in the loan on the Baxter property was 90% and does not mention a prior assignment of mortgage to Blackport.

3)  The report was false because on or about June 15, 2010, WOOD had signed an assignment of the mortgage on the Baxter property to Blackport.

4)  On or about June 15, 2010, WOOD sent or caused to be sent, by mail or wire, an assignment of interest in mortgage, promissory note, and loan documents to New York. *See* Exhibit "49."

5)  This action was part of the fraudulent scheme to convey away Plaintiffs' assets because the assignment at issue, regarding the Baxter property, was not disclosed to HPC US 2 and continued to be represented to HPC US 2 as part of its portfolio well after the assignment.

6)  The status report was also false because on or about March 28, 2012, WOOD signed a satisfaction of the Baxter mortgage on behalf of both Blackport and HPC US 2.

7)  On or about March 28, 2012, WOOD sent or caused to be sent, by mail or wire, a satisfaction of HPC US 2's interest in the Baxter property mortgage. *See* Exhibit "50."

8)  GIES witnessed the satisfaction of the Baxter mortgage, but nevertheless continued to represent the property as a loan interest on financial statements he prepared for Plaintiffs. *See* Exhibit "11."

9)  This action was part of the fraudulent scheme to convey away Plaintiffs' assets because the satisfaction was not disclosed to HPC US 2, nor were the proceeds provided to HPC US 2 or accounted for to HPC US 2.

h.      Predicate Act # 3

1)  On or about February 15, 2012, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "111."

2)  The report represented to the Plaintiffs that the Myra Jordan property was still in Plaintiffs' portfolios and that the property would be continued to be marketed for sale.

3)  The report was false because on or about December 9, 2011, WOOD had deeded the property to a third party.

4)  On or about December 9, 2011, WOOD sent or caused to be sent, by mail or wire, a deed conveying the Myra Jordan property to a third party in exchange for $800,000.00. *See* Exhibit "25."

5) GIES knew that the Myra Jordan property had sold and was not being reflected as sold on several status reports that were received by Plaintiffs, but GIES did not inform Plaintiffs of the truth and continued to reflect the Myra Jordan property as an asset on financial documents he prepared for Plaintiffs. *See* Exhibit "11."

i.   Predicate Act # 4

1) On or about November 26, 2012, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "112."

2) The report represented to the Plaintiffs that the Deerka property was still in HPC US 2's portfolio and that a payoff of the loan was expected after a summary judgment hearing.

3) The report was false because according to UCC filings on or about March 12, 2012, HPC US 2's status as a secured party had been terminated and a new secured party had been listed, Viv Management Company, an entity controlled by MAYER's sister.

4) Moreover, from approximately October 2, 2009 to March 7, 2012 partial releases/satisfactions of the Deerka mortgage had been recorded without HPC US 2's knowledge. *See* Exhibit "55."

     5) GIES' financial statements prepared as of December 31, 2012 continued to reflect the Deerka loan interest as an asset of HPC US 2. *See* Exhibit "11."

    j.      Predicate Act # 5

     1) On or about February 7, 2013, WOOD sent by wire an email to Plaintiffs' representative, Michael Pirgmann, with a status report attached. *See* Exhibit "113."

     2) The report represented to the Plaintiffs that the loan for the Jaramillo Apartments properties was being paid at $7,500.00 per month.

     3) The report was false because on or about November 2, 2011 and July 3, 2012, WOOD had recorded satisfactions of the loan on the Jaramillo properties, WOOD did not account to Plaintiffs for those satisfactions, and based on the balance of Plaintiffs bank accounts, Plaintiffs have not received any benefit relating to the satisfactions of mortgage.

     4) GIES witnessed the November 2, 2011 satisfaction, but nevertheless continued to reflect a loan interest for the Jaramillo properties on financial statements he prepared as of December 31, 2012. *See* Exhibit "11."

    k.      Predicate Act # 6

     1) On or about May 14, 2013, WELLESLEY sent or caused to be sent by wire a statutory warranty deed regarding the

Alaska property that was recorded by May 22, 2013.  *See* Exhibit "6."

2) BURGESS signed the deed and was required to transmit his signature page, or cause it to be transmitted, to at least one of the following states:  Washington, Hawaii, or Alaska.

3) Sending the deed, or causing it to be sent, allowed the RICO Defendants to receive a significant sum of money for the sale of the Alaska property to a third party to HPC US 2's detriment. The RICO Defendants had already fraudulently transferred the property out of HPC US 2's name whereby WELLESLEY paid less than reasonably equivalent or fair market value for the property.

l.    Predicate Act # 7

1) On or about December 10, 2012, WOOD mailed or caused to be mailed a quitclaim deed, attached hereto as Exhibit "14," to be recorded in Atlantic County, New Jersey.

2) The deed states that it was prepared by WOOD.

3) The deed states that Wextrust/HPC Mortgage Fund L.P. conveys the property to ATLANTIC CITY PROPERTIES.

4) Prior    to    filing    this    lawsuit,    the    website, www.welleyleyfunds.com, displayed the Atlantic City property as a completed project.

5) The website continues to list BRETON and BURGESS as officers of WELLESLEY.

6) At all relevant times, WOOD's status reports and GIES' financial documents represented to HPC US 1, that the Atlantic City property remained in its ownership portfolio.

m.   Predicate Act # 8

1) On or about July 17, 2013, the RICO Defendants, mailed or caused to be mailed or sent by wire or caused to be sent by wire, a warranty deed conveying the Ruston property. *See* Exhibit "21."

2) The deed conveyed the property to WELLESLEY.

3) Meanwhile, WOOD was representing to Plaintiffs that no transfer had occurred.

p.   .Predicate Act # 9

1) On or about July 3, 2012, WOOD sent or caused to be sent, by mail or wire, a deed conveying the Arbor Vitae/Sharp property, in which HPC US 2 has an interest, to be recorded in Wisconsin. *See* Exhibit "68."

2) This action was part of the fraudulent scheme to convey away Plaintiffs' assets because the deed was not disclosed to HPC US 2 and HPC US 2 did not receive any proceeds from the sale of its property, nor did WOOD account to HPC US 2 for the proceeds.

3) Despite the Arbor Vitae/Sharp property having been sold, and evidence that GIES received proceeds from that sale, GIES continued to represent the property as an asset on the financial statement he prepared as of December 31, 2012. *See* Exhibit "11."

q.   Predicate Acts # 10 and 11.

1) On or about May 30, 2013 and May 2, 2012, WOOD sent or caused to be sent, by mail or wire, deeds conveying portions of HPC US 2's interest in the Schwantes property to be recorded in Wisconsin. *See* Exhibits "71" and "73."

2) This action was part of the fraudulent scheme to convey away Plaintiffs' assets because the deeds were not disclosed to HPC US 2 and HPC US 2 did not receive any proceeds from the sale of its property interests, nor did WOOD account to HPC US 2 for the proceeds.

3) GIES knew that at least one of the Schwanted properties had been sold, but did not inform HPC US 2 of the truth.

354.   Pursuant to and in furtherance of their fraudulent scheme, the RICO Defendants committed multiple related acts of mail and wire fraud.

355.   The acts of mail and wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

356.   The predicate acts of mail and wire fraud are related to each other by virtue of common participants, common victims, common methods of commission, a common purpose, and a common result.

357.    The illegal conduct is of a continuous nature and presents the threat of future illegal conduct.

358.    The RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

359.    As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that:

    a.    The acts of mail and wire fraud enabled the conveyance of Plaintiffs' real property interests without Plaintiffs' knowledge and without any benefit accruing to Plaintiffs. Plaintiffs have received no funds from the transfers described herein and in some instances has been denied the value received by the RICO Defendants upon sale of the properties to a third party.

    b.    The deeds and assignments effectively transferred Plaintiffs' property interests to the other Defendants or third parties to the direct harm of Plaintiffs.

    c.    Regarding the status reports and annual statements sent to Plaintiffs on multiple occasions, Plaintiffs relied on the misrepresentations and omissions contained therein to their detriment.

    d.    While investigation is still ongoing, Plaintiff has discovered losses amounting to approximately $10 million regarding the properties specifically alleged herein.

e.      Plaintiffs' injuries are a reasonably foreseeable, concrete result of the

RICO Defendants' acts of mail and wire fraud.

WHEREFORE, Plaintiffs demand judgment against the RICO Defendants for all damages including: pre-judgment and post-judgment interest, actual damages, treble damages, reasonable attorneys' fees and costs, pursuant to 18 USC § 1964, and any further relief as this Court deems just and proper.

## <u>COUNT II – VIOLATION OF 18 USC §1962(d) – RICO CONSPIRACY</u>

360.    Plaintiffs adopt and reallege paragraphs 1 through 346, and 347 through 359 (Civil RICO), above as if fully set forth herein.

361.    This Count is against the RICO Defendants, as defined in Count I.

362.    As set forth above, the RICO Defendants, via the predicate acts of mail and wire fraud, furthered a scheme to defraud Plaintiffs. In some instances, the property interests were conveyed to one of the Defendants in order for that Defendant to sell the interest at a significantly increased price or to otherwise benefit from Plaintiffs' property interests. In other instances, Plaintiffs properties were later used by a Defendant, like WELLESLEY, to induce third parties to invest with that Defendant.

363.    The RICO Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. At the very least, the relationships and connections among the RICO Defendants, and their conduct as described in this Complaint, infers the existence of a conspiracy. The foregoing is sufficient to show a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

364.    As a direct and proximate result of the RICO Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs

have been injured in their business and property in that Plaintiffs' property interests have been conveyed out of Plaintiffs' portfolio without the knowledge of Plaintiffs or the benefit of such conveyances accruing to Plaintiffs. In many instances, Plaintiffs' property interests were conveyed for less than reasonably equivalent or fair market value by WOOD to the other Defendants and then generating a significant amount of money once in the hands of those Defendants that would otherwise have accrued to Plaintiffs.

WHEREFORE, Plaintiff requests that this Court enter judgment against the RICO Defendants as follows: including actual damages, treble damages, attorneys' fees and costs, and any and all such further relief as this Court deems just and proper.

## COUNT III – VIOLATION OF FLA. STAT. § 895.03 (FLORIDA RICO)

365.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

366.    Plaintiffs particularly incorporate the allegations made above with respect to the federal RICO causes of action, paragraphs 347 through 364.

367.    This Count is against all of the RICO Defendants, as defined in Counts I and II.

368.    The RICO Defendants have violated Fla. Stat. § 895.03(3) and (4).

369.    The RICO Defendants have engaged in a racketeering activity as defined in Fla. Stat. § 895.02(1)(b) by virtue of the conduct described in Count I as amounting to racketeering activity under 18 U.S.C. § 1961(1).

370.    The RICO Defendants have also conspired or endeavored to violate Fla. Stat. § 895.03(3).

371.    The RICO Defendants make up an enterprise as defined in Fla. Stat. § 895.02(3).

372.     The enterprise has engaged in a pattern of racketeering activity as defined in Fla. Stat. § 895.02(4), and as more particularly described in Count I, and conspiracy to do so as described in Count II.

373.     As a direct and proximate result of the RICO Defendants' racketeering activity, Plaintiffs have suffered harm.

WHEREFORE, Plaintiffs demand judgment against the RICO Defendants for all damages and equitable relief including: injunctive relief, pre-judgment and post-judgment interest, actual damages, treble damages, reasonable attorneys' fees and costs, pursuant to Fla. Stat. § 895.05, and any further relief as this Court deems just and proper.

## COUNT IV – FRAUD

### (AGAINST WOOD)

374.     Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

375.     WOOD made material false statements to Plaintiffs that their property interests continued to belong to them via status reports and annual statements.

376.     In reality, WOOD had already conveyed or assigned Plaintiffs' interests in the properties to third parties and/or other Defendants.

377.     Because no one has accounted to Plaintiffs for any proceeds and given the de minimus balances of Plaintiffs' bank accounts, Plaintiffs can only conclude that WOOD retained the proceeds of all such conveyances or assignments for his own use or transferred the proceeds to third parties or other Defendants for his benefit.

378.     WOOD also benefitted from conveying monies from Plaintiffs' accounts and Plaintiffs' property interests to certain other Defendants.

379.   WOOD knew or should have known that the statements were false at the time he made the material false statements.

380.   WOOD made the statements with the purpose of inducing Plaintiffs to rely on those statements and to permit WOOD to have continued access to Plaintiffs' property interests without Plaintiffs discovering the conveyances and assignments of their property interests.

381.   Plaintiffs justifiably relied on WOOD's false statements to their detriment.

382.   As a result of Plaintiffs' detrimental reliance, Plaintiffs suffered damages as a direct and proximate result of WOOD's fraud.

WHEREFORE, Plaintiffs demand judgment against WOOD for all damages including: pre-judgment and post-judgment interest, and any further relief as this Court deems just and proper.

## COUNT V – FRAUD

### (AGAINST GIES)

383.   Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

384.   GIES made material false statements that he provided to Plaintiffs or knew would be relayed to Plaintiffs that Plaintiffs' property interests continued to belong to them via annual and other financial statements, including but not limited to the annual statements prepared "[a]s of December 31, 2012" for both funds (hereinafter the "2012 annual statements"). *See* Exhibit "11."

385.   Specifically, the 2012 annual statements prepared, at least in part by GIES, show properties as assets of Plaintiffs that had previously been conveyed out of Plaintiffs' portfolios.

386.    GIES witnessed several of the conveyances and had knowledge of others at the time the false financial statements were provided to Plaintiffs; including but not limited to Myra Jordan, Schwantes, Baxter.

387.    GIES knew or should have known that the financial statements he prepared for Plaintiffs, including the 2012 annual statements, contained material false statements at the time he made the material false statements.

388.    GIES benefitted by making the false financial statements because he worked for Plaintiffs and continued to derive income from his work for Plaintiffs and receive other monies related to Plaintiffs' property interests.

389.    Plaintiffs justifiably relied on GIES's false financial statements to their detriment.

390.    As a result of Plaintiffs' detrimental reliance, Plaintiffs suffered damages as a direct and proximate result of GIES's fraud.

391.    In particular, Plaintiffs continued to allow GIES and WOOD to manage their portfolios based in large part on the financial statements at issue.

WHEREFORE, Plaintiffs demand judgment against GIES for all damages including: pre-judgment and post-judgment interest, and any further relief as this Court deems just and proper.

## COUNT VI – BREACH OF FIDUCIARY DUTY

### (AGAINST WOOD)

392.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

393.    Plaintiffs reposed their confidence and trust in WOOD to manage Plaintiffs' property interests and to perform various other management duties for Plaintiffs.

394.    WOOD was entrusted with all of Plaintiffs' property interests and bank accounts, and had access to the same.

395.    WOOD accepted this trust and confidence, and agreed to act in the best interests of Plaintiffs, but subsequently betrayed Plaintiffs trust and confidence, and failed to act in their best interests.

396.    By virtue of the services WOOD performed for Plaintiffs' as the manager of their property interests, including other duties, WOOD owed Plaintiffs a fiduciary duty.

397.    Included within the scope of his fiduciary duty, WOOD owed Plaintiffs a duty to provide truthful statements about the status of Plaintiffs' property interests.

398.    WOOD breached the fiduciary duty he owed to Plaintiffs by taking the acts described in this action, including but not limited to conveying Plaintiffs' property interests without Plaintiffs' knowledge or permission, continuing to represent to Plaintiffs' that certain property interests remained in their portfolios after conveying those interests, failing to account to Plaintiffs' for the proceeds of conveyances of their property interests, and preventing the benefit of the conveyances of Plaintiffs' property interests from inuring to Plaintiffs.

399.    As a direct and proximate result of WOOD's breaches, Plaintiffs have suffered damages, including but not limited to the loss of their property interests and the value of those property interests.

WHEREFORE, Plaintiffs respectfully demand judgment to be entered against WOOD, awarding monetary damages, including interest, arising from WOOD's breach of fiduciary duty, and for any such other and further relief that this Court deems just and proper.

## COUNT VII – CONSTRUCTIVE TRUST

### (AGAINST WOOD, MAYER, MAYER PARTNERSHIP, PAN AMERICAN, WELLESLEY, RITE TIMING, TRIBECA, ATLANTIC CITY PROPERTIES, AND DE LOS REYES PROPERTIES)

400.    Plaintiffs adopt and reallege paragraphs 1 through 346, and 374 through 382 (Fraud against WOOD), above as if fully set forth herein.

401.    WOOD perpetrated a fraud against Plaintiffs.

402.    Alternatively, WOOD had a confidential relationship with Plaintiffs.

403.    WOOD's relationship with the Plaintiffs enabled him to have access to Plaintiffs' property interests and bank accounts.

404.    As part of the relationship, WOOD made an implied promise that the status reports and annual statements he would provide to Plaintiffs regarding their property interests would be true and correct.

405.    WOOD has impermissibly and fraudulently conveyed and assigned Plaintiffs' property interests and has not accounted to Plaintiffs for the proceeds received by or benefitting WOOD as a result of his transfers of Plaintiffs' property interests to third parties and other Defendants, such as WELLESLEY, RITE TIMING, TRIBECA, ATLANTIC CITY PROPERTIES, and DE LOS REYES PROPERTIES.

406.    WOOD has also impermissibly allowed other Defendants, such as MAYER, MAYER PARTNERSHIP, and/or PAN AMERICAN to collect mortgage payments or monies related thereto that were rightfully owed to one of the Plaintiffs and participated in the satisfactions of the Deerka Mortgage by PAN AMERICAN and MAYER PARTNERSHIP.

407.    WOOD has continued to represent to Plaintiffs on status reports and annual statements that Plaintiffs' property interests remained in Plaintiffs' ownership or control even after conveying or assigning the same to other Defendants and third parties.

408.    WOOD has been unjustly enriched by his impermissible transfers of Plaintiffs' property interests and the proceeds stemming from those transfers.

409.    As a direct and proximate result of WOOD's actions, Plaintiffs have been harmed by the transfer of their property interests without Plaintiffs' knowledge and without compensation for the same.

410.     In order to return those property interests to Plaintiffs, and where not possible the proceeds stemming from those interests, a constructive trust should be imposed because even where WOOD received funds in consideration for the conveyance of Plaintiffs' interests, the funds received appear to be significantly less than the value of the property interest conveyed, Plaintiffs did not receive the benefit of the conveyances, and some, if not all, of the other Defendants may have had actual or constructive notice of the fraud.

WHEREFORE, Plaintiffs respectfully request that this Court impose a constructive trust on Plaintiffs' property interests that have been fraudulently transferred by WOOD to other Defendants and third parties, and any proceeds stemming therefrom, issue a preliminary injunction to protect the availability of the equitable remedy of constructive trust while the instant action is pending, and grant any and all such further relief as this Court deems just and proper.

## COUNT VIII – CONVERSION

### (AGAINST WOOD)

411.     Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

412.     Plaintiffs have a right to possession of the property interests at issue.

413.     WOOD's unauthorized actions have deprived Plaintiffs of their right to possession.

414.     Specifically, WOOD has improperly conveyed away the property interests belonging to Plaintiffs in excess of his authority as manager of Plaintiffs' property interests, without the knowledge of Plaintiffs, without accounting for the conveyances to Plaintiffs, and without providing the proceeds to Plaintiffs or by diverting proceeds away from Plaintiffs.

415.     Given the alleged conduct by WOOD, it is not necessary to demand the return of the property because such demand would be futile.

WHEREFORE, Plaintiffs respectfully demand judgment to be entered against WOOD, and for any such other and further relief that this Court deems just and proper.

### COUNT IX – TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

**(AGAINST WOOD, WHYDAH, WELLESLEY, BURGESS, BRETON, PAN AMERICAN, DE LOS REYES, DE LOS REYES PROPERTIES, ATLANTIC CITY PROPERTIES, TRIBECA, RITE TIMING, MAYER, MAYER PARTNERSHIP, AND GIES)**

416.     Plaintiff adopts and realleges paragraphs 1 through 346; 345-372 (RICO counts); and 399-409 (Constructive Trust) above as if fully set forth herein.

417.     This Court has authority to enter an injunction to protect the availability of the equitable relief sought by Plaintiff, including but not limited to constructive trust, and pursuant to the provisions of Florida's RICO statute, section 895.05.

418.     WOOD must be temporarily and permanently enjoined from conveying property interests belonging to Plaintiffs.

419.     GIES must be temporarily and permanently enjoined from conveying property interests belonging to Plaintiffs.

420.     WELLESLEY knew or should have known that WOOD did not have authority or was exceeding the scope of his authority by conveying the property interests at issue on behalf of Plaintiffs.

421.     WELLESLEY was not a bona fide purchaser because any conveyance of property interests between WOOD and WELLESLEY is an insider conveyance, and the Alaska and Ruston conveyances were not for fair market value.

422.     BRETON and BURGESS knew or should have known that WOOD did not have authority or was exceeding the scope of his authority by conveying the property interests at issue on behalf of Plaintiffs, or that the conveyances were not for fair market value, and used WELLESLEY, their alter ego, to receive the property interests conveyed by WOOD, an insider.

423.     DE LOS REYES knew or should have known that WOOD did not have authority or was exceeding the scope of his authority by conveying the property interests at issue on behalf of Plaintiffs, and used his alter ego companies, DE LOS REYES PROPERTIES, TRIBECA, and ATLANTIC CITY PROPERTIES, to receive the property interests conveyed by WOOD for less than fair market value.

424.     Likewise, DE LOS REYES, who was listed as president of RITE TIMING on the Florida Department of State Records on or about August 26, 2013, and retroactive to May 2013, had knowledge that WOOD did not have authority or was exceeding the scope of his authority by conveying the Secret Lake property, and used RITE TIMING as an alter ego, to benefit from the conveyance of the property interest by WOOD.

425.     MAYER and/or MAYER PARTNERSHIP and PAN AMERICAN knew or should have known that the Deerka mortgage interest belonged to and should have inured to Plaintiffs' benefit.

426.     GIES knowingly received funds stemming from the property interests described herein, committed fraud as alleged herein, and participated in at least a portion of the misconduct alleged against WOOD.

427.     Plaintiffs have demonstrated a substantial likelihood of success on the merits.

428.     Failure to grant an injunction will result in irreparable injury or harm to Plaintiffs.

429.     These injuries include, but are not limited to, loss of the properties and funds belonging to or rightfully owed to Plaintiffs.

430.     The injuries alleged herein outweigh any damage that the injunction may cause Defendants.

431.     The requested injunctive relief will not disserve the public interest because this is a private dispute.

432.     Under these circumstances, the balance of hardships favors Plaintiffs.

433.     Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs request the Court enter an Order, and Judgment, temporarily and permanently enjoining Defendants from selling property interests which Plaintiffs have or had an interest, retaining the proceeds from sales of property interests which Plaintiffs have or had an interest, or from otherwise dissipating or misappropriating assets which belong(ed) to or were under the control of Plaintiffs or binding Plaintiffs in any way, and award any such other relief as may be just and equitable.

## <u>COUNT X – UNJUST ENRICHMENT</u>

### (AGAINST WOOD)

434.     Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

435.     Plaintiffs have conferred a benefit upon WOOD because WOOD sold, satisfied, and/or assigned property interests owned or controlled by Plaintiffs and, upon information and belief, kept the proceeds or otherwise benefitted from the sales, satisfactions, and/or assignments.

436.     WOOD benefitted by receiving the proceeds of the sales, satisfactions, and assignments of Plaintiffs' property interests, or by otherwise diverting the proceeds away from Plaintiffs.

437.     WOOD also benefitted from being able to transfer Plaintiffs' property interests and/or proceeds therefrom to the other Defendants.

438.    WOOD has voluntarily accepted and retained the benefits conferred upon him.

439.    Plaintiffs have not received any benefit in return for the benefit conveyed upon WOOD.

WHEREFORE, Plaintiffs respectfully demands judgment to be entered in favor of the Plaintiffs and against WOOD, and for any such other and further relief that this Court deems just and proper.

## COUNT XI – UNJUST ENRICHMENT

### (AGAINST GIES)

440.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

441.    Plaintiffs have conferred a benefit upon GIES because GIES received funds stemming from Plaintiffs property interests, including but not limited to the Hilcrest property, and kept the proceeds.

442.    GIES has voluntarily accepted and retained the benefits conferred upon him.

443.    Plaintiffs have not received any benefit in return for the benefit conveyed upon GIES.

WHEREFORE, Plaintiffs respectfully demands judgment to be entered in favor of the Plaintiffs and against GIES, and for any such other and further relief that this Court deems just and proper.

## COUNT XII – UNJUST ENRICHMENT

### (AGAINST MAYER, MAYER PARTNERSHIP, and PAN AMERICAN)

444.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

445.    HPC US 2 has conferred a benefit upon MAYER, MAYER PARTNERSHIP, and/or PAN AMERICAN because MAYER, MAYER PARTNERSHIP, and/or PAN AMERICAN received mortgage payments under the Deerka mortgage or monies related thereto that should have been paid to HPC US 2 and kept the proceeds.

446.    MAYER, MAYER PARTNERSHIP, and/or PAN AMERICAN has voluntarily accepted and retained the benefits conferred upon them.

447.    HPC US 2 has not received any benefit in return for the benefit conveyed upon MAYER, MAYER PARTNERSHIP, and/or PAN AMERICAN.

WHEREFORE, HPC US 2 respectfully demands judgment to be entered in favor of HPC US 2 and against MAYER, MAYER PARTNERSHIP, and/or PAN AMERICAN, and for any such other and further relief that this Court deems just and proper.

## COUNT XIII– UNJUST ENRICHMENT

### (AGAINST DE LOS REYES)

448.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

449.    Plaintiffs have conferred a benefit upon DE LOS REYES because DE LOS REYES received at least $19,798.31 from an account in the name of Blackport doing business as HPC Loan Servicer. *See* Exhibit "104."

450.    Plaintiffs assert that the monies received by DE LOS REYES were proceeds of Plaintiffs' property interests.

451.    DE LOS REYES benefitted by receiving the monies.

452.    DE LOS REYES has voluntarily accepted and retained the benefits conferred upon him.

453.    Plaintiffs have not received any benefit in return for the benefit conveyed upon DE LOS REYES.

WHEREFORE, Plaintiffs respectfully demands judgment to be entered in favor of the Plaintiffs and against DE LOS REYES, and for any such other and further relief that this Court deems just and proper.

## COUNT XIV – UNJUST ENRICHMENT

### (AGAINST DE LOS REYES PROPERTIES)

454.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

455.    Plaintiffs have conferred a benefit upon DE LOS REYES PROPERTIES.

456.    Specifically, DE LOS REYES PROPERTIES appears to have received approximately $849,187.57 from a bank account in the name of WHYDAH. *See* Exhibit "94."

457.    Plaintiffs assert that the monies received by DE LOS REYES PROPERTIES were proceeds of Plaintiffs' property interests.

458.    DE LOS REYES PROPERTIES also received the assignment of Plaintiffs' interest in the Commodore Plaza mortgage. *See* Exhibit "38."

459.    DE LOS REYES PROPERTIES also received monies related to the Commodore Plaza mortgage in consideration for the partial release of that mortgage. *See* Exhibits "38" and "39."

460.    HPC US 2 asserts that all funds received in relation to the Commodore Plaza mortgage should have accrued to HPC US 2 and otherwise belong to HPC US 2.

461.    DE LOS REYES PROPERTIES benefitted by receiving the monies and property interest.

462.    DE LOS REYES PROPERTIES has voluntarily accepted and retained the benefits conferred upon it.

463.    Plaintiffs have not received any benefit in return for the benefit conveyed upon DE LOS REYES PROPERTIES.

WHEREFORE, Plaintiffs respectfully demand judgment to be entered in favor of Plaintiffs and against DE LOS REYES PROPERTIES, and for any such other and further relief that this Court deems just and proper.

## <u>COUNT XV – UNJUST ENRICHMENT</u>

### **(AGAINST RITE TIMING)**

464.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

465.    HPC US 1 has conferred a benefit upon RITE TIMING.

466.    Specifically, RITE TIMING was deeded HPC US 1's property, the Secret Lake property. *See* Exhibit "30."

467.    RITE TIMING benefitted by receiving the property.

468.    RITE TIMING has voluntarily accepted and retained the benefits conferred upon it.

469.    HPC US 1 has not received any benefit in return for the benefit conveyed upon RITE TIMING.

WHEREFORE, HPC US 1 respectfully demands judgment to be entered in favor of HPC US 1 and against RITE TIMING, and for any such other and further relief that this Court deems just and proper.

## COUNT XVI – QUIET TITLE

### (AGAINST RITE TIMING)

470.    Plaintiff adopts and realleges paragraphs 1 through 346 above as if fully set forth herein.

471.    This is an action to quiet title to the Secret Lake property located in Osceola County, Florida.

472.    HPC US 1 is the true legal and equitable owner of the Secret Lake property.

473.    A title search of the Secret Lake property shows title improperly vested in RITE TIMING.

474.    As alleged herein, WOOD fraudulently signed a quitclaim deed purporting to convey the Secret Lake property to RITE TIMING.

475.    RITE TIMING is holding title to the Secret Lake property as trustee for the equitable title-owner of the Secret Lake Property, HPC US 1.

**WHEREFORE,** Plaintiff, HPC US Fund 1, L.P, demands judgment against RITE TIMING SERVICES CORP. quieting title to the Secret Lake property in HPC US Fund 1, L.P and all persons claiming under RITE TIMING SERVICES CORP.; finding that the Secret Lake property is free from encumbrances, granting fees and costs in bringing this action to HPC US Fund 1, L.P, and such other relief as this honorable Court deems just and proper.

## COUNT XVII – DECLARATORY RELIEF

### (AGAINST RITE TIMING)

476.    Plaintiffs adopt and realleges paragraphs 1 through 346 above as if fully set forth herein.

477.    An actual, bona fide dispute exists between HPC US 1 and RITE TIMING pertaining to the validity of the quitclaim deed purportedly transfering the Secret Lake property, and HPC US 1's right, title, and interest in the Secret Lake property to RITE TIMING.

478.    Because title to the Secret Lake property was purportedly transferred to RITE TIMING, HPC US 1's interest in the Secret Lake property is in doubt.

479.    A title search of the Secret Lake property improperly shows title vested in RITE TIMING.

480.    HPC US 1 has a bone fide, actual, and present need for a determination of its rights, interests, and so forth to the Secret Lake property.

**WHEREFORE,** HPC US Fund 1, L.P., demands judgment against RITE TIMING SERVICES CORP. quieting title to the Secret Lake property in HPC US Fund 1, L.P., and against RITE TIMING SERVICES CORP., and all persons claiming under RITE TIMING SERVICES CORP., finding that the Secret Lake property is free from encumbrances, granting fees and costs in bringing this action to HPC US Fund 1, L.P., and such other relief as this honorable Court deems just and proper.

## COUNT XVIII – DECLARATORY RELIEF

### (AGAINST DE LOS REYES PROPERTIES AND WCG)

481.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

482.    A bona fide dispute exists between HPC US 2, DE LOS REYES PROPERTIES, and WCG pertaining to the validity of the Commodore Assignment; right, title, and interest to the funds that were used to satisfy the mortgage—if any; and the priority of HPC US 2 over other parties who may claim an interest in the Commodore Plaza property.

483.    HPC US 2's right, title, and interest in the Commodore Plaza property and the Commodore Mortgage is in doubt.

484.    HPC US 2 has a justiciable question as to its security interest in the Commodore Plaza property.

485.    A bona fide, actual, and present need for the declaration of the rights of the HPC US 2, DE LOS REYES PROPERTIES, and WCG is needed to resolve this dispute.

**WHEREFORE**, Plaintiff, HPC US Fund 2, L.P, respectfully requests that this Honorable court declare the Commodore Assignment void, declare that HPC US Fund 2, L.P., is the legal and equitable owner of the Commodore Mortgage, declare that HPC US Fund 2, L.P., maintains priority over all other liens on the property, and for any such other relief this Honorable Court deems just and proper.

## COUNT XIX – RESCISSION

### (AGAINST DE LOS REYES PROPERTIES)

486.    Plaintiffs adopt and reallege paragraph 1 through 346 above as if fully set forth herein.

487.    WOOD assigned the Commodore Mortgage to DE LOS REYES PROPERTIES in excess of the scope of, or without possessing, the authority, capacity, and ability to transfer the Commodore Mortgage.

488.    The Commodore Assignment to DE LOS REYES PROPERTIES was the product of fraud, deceit, trickery, or artifice.

489.    DE LOS REYES PROPERTIES possessed actual or constructive knowledge or notice that WOOD did not possess, or was acting in excess of the scope of, the authority, capacity, or ability to transfer the Commodore Mortgage.

490. The Commodore Assignment was made for less than reasonably equivalent value or no value at all.

491. Contact and notifying DE LOS REYES PROPERTIES of the rescission of the Commodore Assignment would be futile.

492. HPC US 2 has hereby rescinded the Commodore Assignment.

493. HPC US 2 offers to restore DE LOS REYES PROPERTIES any benefit HPC US 2 received in conjunction with the Commodore Assignment; however, upon and information and belief, HPC US 2 received nothing in consideration for the Commodore Assignment, and therefore restoration is impossible.

494. Absent equitable relief, HPS US 2 has no adequate remedy at law.

**WHEREFORE**, Plaintiff, HPC U.S. Fund 2, L.P., respectfully requests that this Honorable Court rescind the Commodore Assignment referenced herein; adjudicate the Commodore Assignment as void; return the parties to their respective positions as they existed before the Commodore Assignment was executed and recorded; and for any other relief this Honorable Court deems just and proper.

<u>**COUNT XX– DECLARATORY RELIEF**</u>

**(AGAINST PAN AMERICAN, MAYER PARTNERSHIP, AND DEERKA CORP.)**

495. Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

496. A bona fide dispute exists between HPC US 2, PAN AMERICAN, MAYER PARTNERSHIP, and DEERKA CORP. pertaining to the validity of the Deerka Mortgage, the subsequent satisfactions/releases of the Deerka Mortgage, the termination of HPC US Fund 2, L.P.'s UCC Financing Statement; right, title, and interest to the funds that were used to satisfy

the mortgage—if any; and the priority of HPC US 2 over other parties who may claim an interest in the Deerka Property and the Deerka Mortgage.

497.   HPC US 2's right, title, and interest in the Deerka Property and the Deerka Mortgage is in doubt.

498.   HPC US 2 has a justiciable question as to its security interest in the Deerka Property and the Deerka Mortgage.

499.   A bona fide, actual, and present need for the declaration of the rights of the HPC US 2, DEERKA CORP., MAYER PARTNERSHIP, and PAN AMERICAN is needed to resolve this dispute.

**WHEREFORE**, Plaintiff, HPC US Fund 2, L.P, respectfully requests that this Honorable court declare the Satisfactions/Releases of Mortgage that were executed after the Deerka Assignment are void and ineffective, declare that HPC US Fund 2, L.P., is the legal and equitable owner of the Deerka Mortgage, declare that HPC US Fund 2, L.P., maintains priority over all other liens on the Deerka Property, and for any such other relief this Honorable Court deems just and proper.

## COUNT XXI—RESCISSION

### (AGAINST PAN AMERICAN, MAYER PARTNERSHIP, AND DEERKA CORP.)

500.   Plaintiffs adopt and reallege paragraphs 1 through 346 above as fully set forth herein.

501.   HPC US 2's UCC Financing Statement granting it an interest in the Deerka Mortgage should not have been terminated.

502.    The Satisfactions/Releases of the Deerka Mortgage by PAN AMERICAN and the MAYER PARTNERSHIP after the Assignment of the Deerka Mortgage were the product of fraud, deceit, trickery, or artifice.

503.    The satisfactions/releases of the Deerka Mortgage by PAN AMERICAN and the MAYER PARTNERSHIP are void.

504.    The termination of HPC US 2's UCC Financing Statement and the erroneous satisfactions/releases of the Deerka Mortgage were made for less than reasonably equivalent value or no value at all being received by HPC US 2.

505.    Contact and notification to MAYER PARTNERSHIP, PAN AMERICAN, and DEERKA CORP. of rescission and request for return of the Deerka mortgage would be futile.

506.    HPC US 2 has hereby rescinded the termination of its UCC Financing Statement and all releases satisfactions executed after the Deerka Mortgage was assigned to HPC US 2.

507.    HPC US 2 offers to restore DEERKA CORP., MAYER PARTNERSHIP, PAN AMERICAN, any benefit HPC US 2 received in conjunction with the partial releases/satisfactions of the Deerka Mortgage; however, upon information and belief, HPC US 2 received nothing in consideration for the partial releases/satisfactions of the Deerka Mortgage, and therefore restoration is impossible.

508.    Absent equitable relief, HPC US 2 has no adequate remedy at law.

**WHEREFORE**, Plaintiff, HPC U.S. Fund 2, L.P., respectfully requests that this Honorable Court rescind the termination of HPC US 2's UCC Financing Statement granting HPC US 2 an interest in the Deerka Mortgage referenced herein; adjudicate the termination of HPC US 2's UCC Financing Statement as void; rescind the satisfactions/releases of the Deerka Mortgage; return the parties to their respective positions as they existed before the termination of

HPC US 2's UCC Financing Statement and the satisfactions/releases of the Deerka Mortgage were executed and filed; and for any other relief this Honorable Court deems just and proper.

## COUNT XXII– DECLARATORY RELIEF

### (AGAINST HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE AND GASTON MHP)

509.    Plaintiffs adopt and reallege paragraphs 1 through 346 above as if fully set forth herein.

510.    A bona fide dispute exists between HPC US 2, HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE, and GASTON MHP pertaining to the validity and enforcement of the purported satisfaction of the Hilcrest Mortgage; right, title, and interest to the funds that were used to satisfy the Hilcrest mortgage—if any; right, title, interest, and enforcement of the Hilcrest Mortgage; and the priority of HPC US  2 over other parties who may claim an interest in the Hilcrest Property.

169.    HPC US 2's right, title, and interest in the Hilcrest Property and the Hilcrest Mortgage is in doubt.

170.    HPC US 2 has a justiciable question as to its security interest in the Hilcrest Property.

171.    A bona fide, actual, and present need for the declaration of the rights of the HPC US 2, HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE, and GASTON MHP is needed to resolve this dispute.

**WHEREFORE**, Plaintiff, HPC US Fund 2, L.P, respectfully requests that this Honorable court declare the purported satisfaction of the Hilcrest Mortgage void, declare that HPC US Fund 2, L.P., is the legal and equitable owner of the Hilcrest Mortgage, declare that HPC US Fund 2,

L.P., maintains priority over all other liens on the Hilcrest Property, and for any such other relief this Honorable Court deems just and proper.

## COUNT XXIII—RESCISSION

### (AGAINST HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE AND GASTON MHP)

511.    Plaintiff realleges and reincorporates by reference paragraphs 1 through 346 as fully set forth herein.

512.    The purported satisfaction of the Hilcrest Mortgage was the product of fraud, deceit, trickery, or artifice.

513.    The purported satisfaction of the Hilcrest Mortgage by WOOD is void.

514.    The purported satisfaction of the Hilcrest Mortgage was made for less than reasonably equivalent value.

515.    Contact and notification to HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE and GASTON MHP of a request for return of the Hilcrest Mortgage would be futile.

516.    HPC US 2 hereby rescinded any purported agreement satisfying the Hilcrest Mortgage.

517.    Absent equitable relief, HPC US 2 has no adequate remedy at law.

518.    HPC US 2 offers to restore HILCREST RESIDENTIAL n/k/a PLEASANT ALTERNATIVE and GASTON MHP any benefit HPC US 2 received in conjunction with the satisfaction of the Hilcrest Mortgage; however, upon information and belief, HPC US 2 received nothing in consideration for the satisfaction of the Hilcrest Mortgage.

**WHEREFORE**, Plaintiff, HPC U.S. Fund 2, L.P., respectfully requests that this Honorable Court rescind the purported satisfaction of the Hilcrest Mortgage; adjudicate the

purported satisfaction of the Hilcrest Mortgage as void; rescind the purported satisfaction of the Hilcrest Mortgage; return the parties to their respective positions as they existed before the purported satisfaction of the Hilcrest Mortgage; and for any other relief this Honorable Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 6, 2013

Respectfully submitted,

TRIPP SCOTT, P.A.
*Counsel for Plaintiffs*
110 Southeast Sixth Street, 15th Floor
Fort Lauderdale, Florida 33301
Telephone:  (954) 525-7500
Facsimile:  (954) 761-8475

By: **/s/ Megan L. Janes_____**
Paul O. Lopez, Esq.
*Florida Bar No. 983314*
pol@trippscott.com
Richard L. Petrovich, Esq.
*Florida Bar No. 567248*
rlp@trippscott.com
B. George Walker, Esq.
*Florida Bar No. 0071049*
bgw@trippscott.com
Megan L. Janes, Esq.
*Florida Bar No. 0099009*
mlj@trippscott.com