UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  13-cv-61825-Hopkins

HPC US FUND 1, L.P., a New York
limited partnership, and HPC US FUND 2, L.P.,
a New York limited partnership.

   Plaintiffs,

v.

DALE WOOD, *et. al.*,

   Defendants.

_____/

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT GIES' MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL

Plaintiffs, **HPC US FUND 1, L.P.**, and **HPC US FUND 2, L.P.**, ("HPC") by and through their counsel, file this Response in Opposition to Defendant Gies' Renewed Motion for Judgment as a Matter of Law and Motion for New Trial, and state as follows:

### INTRODUCTION

Gies, who offered no evidence or testimony at trial, now renews the motions for judgment as a matter of law he claims to have made at the close of HPC's case in chief, and in the alternative requests a new trial based on the weight of the evidence and also on "newly discovered evidence." HPC introduced approximately 517 exhibits into evidence. At least fourteen of those exhibits are summaries distilling the contents of voluminous records. Of particular import to the Fraud and RICO claims now challenged, roughly 23 emails containing status reports falsely reflecting HPC's property interests were sent, or caused to be sent, by Wood and Gies between 2009 and July 2013. In addition to the emails sent HPC, the communications between Wood and Gies, or between Gies and others, establish a pattern of

commingling and defalcation of the proceeds of HPC's property interests, and efforts to conceal the same. Gies assisted in concealing sales, mortgage payoffs, etc from HPC, made the proceeds disappear from HPC's books, and was actively involved in furthering the continued operations of the enterprise: his fraudulent intent cannot be reasonably doubted.

The weight of the evidence supports the jury's verdict, and prior to submission to the jury, the evidence was sufficient to avoid judgment as a matter of law. Gies' attempt to identify one or two exhibits he claims are exculpatory is unavailing. It is the jury's role to consider the credibility and weight of the evidence: Gies does not get to slant the interpretation of evidence only in his favor, and even so, he cannot meet the thresholds for either judgment as a matter of law or for a new trial.

## MEMORANDUM OF LAW

### I.    Motion for New Trial

#### A.  Standard

A motion for new trial must be denied when the verdict is <u>not</u> contrary to the great weight of the evidence. *Iervolino v. Delta Air Lines, Inc.*, 796 F.2d 1408, 1419 (11th Cir. 1986). The standard for a new trial is not merely that the verdict must be against the *greater* weight of the evidence – rather it must be against the *great or clear* weight of the evidence or result in an obvious miscarriage of justice. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001). "Where conflicting testimony is presented and the jury is called upon to make credibility determinations and to weigh the evidence, [the Court should] uphold the verdict as long as there is some support for the jury's decision." *Quick v. City of Birmingham*, 346 F. App'x 494, 495 (11th Cir. 2009). When requesting a new trial based on "newly discovered evidence," the movant must demonstrate that (1) the evidence is newly discovered;

(2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to produce a new outcome if the case were retried. *See Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11th Cir. 1987)[1]. Motions for new trial seek extraordinary relief and should be granted only when the requirements are strictly met. *See Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1316 (11th Cir. 2000).

B. The Management Agreement is **Not** "New" Evidence

Gies had access to Defendant Wood's Exhibit 1, the management agreement, on at least six occasions before trial:

1)      The agreement was introduced during the deposition of Joseph Cartolano on August 15, 2014, prior to cross-examination of the deponent by Gies. *See* Exhibit A (Excerpt of Cartolano Deposition).

2)      On February 3, 2014, Wood filed the management agreement as an exhibit to his Response to Order to Show Cause in the Contempt Proceedings [ECF No. 183]. Mr. Pirgmann was cross-examined by Wood's counsel during the May 8, 2014 contempt hearing, and expressed doubt as to whether the version of the agreement provided was the one negotiated by HPC Management, LLC's lawyers [ECF No. 287]. *See also* Exhibit 452, at pp. 69-76.[2]

3)      The agreement was presented by counsel for Wellesley Asset Secured Portfolio, Inc. as an exhibit during the deposition of George Kalogeropoulos, on August 18, 2014, which counsel for Gies attended. *See* Exhibit B (Excerpt of Kalogeropoulos Deposition).

---

[1] The same test applies for a new trial based on newly discovered evidence under both Rule 59 and Rule 60. *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990) (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2859 (1973) and 7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.23[4] (2d ed. 1987)).

[2] Due to the voluminous nature of several trial exhibits referenced herein, counsel for HPC will provide electronic copies of all trial exhibits via USB drive to the Court upon request, or return the paper copies of exhibits in counsel for HPC's possession.

4)      The management agreement was again introduced as Wellesley Exhibit 1 during the deposition of Dale Wood, on August 18, 2014, at which counsel for Gies was present. *See* Exhibit C (Excerpt of Wood Deposition).

5)      The agreement is exhibit number nine on the De Los Reyes Defendants' exhibit list [ECF No. 511], which Wood adopted as his own exhibit list prior to trial [ECF No. 556].[3]

6)      HPC disclosed the existence of operating/management agreements in their Rule 26 disclosures. *See* Exhibit D (emailed to Gies prior to retaining counsel). Gies also attended a Rule 26 inspection of the voluminous documents hard copy documents seized from the Blackport office, including the management agreement.[4]

Having access to evidence before the ruling at issue removes that evidence from the category of "newly discovered." *See Levinson v. Landsafe Appraisal Servs., Inc.*, 558 F. App'x 942, 946 (11th Cir. 2014). In addition, "[e]vidence that is contained in the public records at the time of trial cannot be considered newly discovered evidence." *Scutieri v. Paige*, 808 F.2d 785, 794 (11th Cir. 1987). The agreement was filed in this proceeding and easily accessible to Gies via PACER; for that reason, and the other opportunities mentioned, the agreement is simply not "newly discovered evidence" warranting a new trial.

At trial, Gies did not object when the management agreement was presented – either prior to the verdict or before the discharge of the jury.  Gies now says he was unable to cross-examine Michael Pirgmann about this document, but did not request the opportunity to recall Mr. Pirgmann, who was in the courtroom when Wood introduced the management agreement. Even

---

[3] The management agreement itself was previously produced by the De Los Reyes Defendants in response to a request for production from HPC, as denoted by bates numbering in the exhibit description: "Management Agreement Group, dated 8/14/09, between HPC Management, LLC and Blackport Investment Group, LLC – GROUP EXH 00192-198" [ECF No. 511].
[4] *See* Exhibit E, Emails and Excerpt of Scanned Documents sent to Counsel for Wellesley based on review of records at same time as Gies. Gies did not propound discovery in this case, and it is not clear whether or not Gies actually saw the management agreement during the inspection.

if Gies had cross-examined Mr. Pirgmann about the document, it would not have caused a "totally different result." Gies' cross-examination already covered much of the same topical ground: the existence of the management agreement was even discussed. *See* Exhibit F, Pirgmann Testimony, 2/10/16, at 47:17-24; 49:10-50:8; 51:12-19. Defendant Wood also questioned his witness, Joseph Klock, Esq. about the management agreement, eliciting the kind of testimony that HPC anticipates Gies would have endeavored to obtain from HPC's witnesses. Mr. Klock testified that the agreement allowed Wood to sell properties, but admitted on cross examination that the agreement did not sanction the stealing of HPC funds. *See* Exhibit G, Klock Testimony, 2/16/16 at 7:16-10:3; 21:11-22:2. Any further testimony about the agreement most likely would be cumulative. Moreover, Gies had an adequate opportunity during his closing argument to reference the management agreement.

Nothing within the terms of the management agreement permits the kind of gross misconduct that Gies and Wood engaged in. In fact, sales of property interests are limited to transactions within the ordinary course of business. Despite Gies' argument in paragraph 58 of his motion, the verdict does not confirm that the sales at issue were occurring in the ordinary course of business, but that the status reports created by the Defendants were sent to HPC in the ordinary course of business. The jury was free to make a factual determination as to whether the conveyances and releases of mortgage at issue were conducted in the ordinary course of business.

Furthermore, the agreement itself refers to the relationship between HPC Management LLC and Blackport Investment Group, LLC. *See* Wood Exhibit 1. Each of the provisions discussing this relationship refer to the Company, which is defined within the agreement as HPC Management LLC. While HPC Management, LLC was the manager of HPC Fund Management,

LLC, which was the general partner of HPC US Fund 1, LP and HPC US Fund 2, LP, the properties at issue are still not "Company property" within the terms of the management agreement. This distinction is one which Gies' own counsel drew at trial regarding the Blackport Operating Agreement. *See* Pirgmann Testimony, 2/10/16, at 50:19-51:11. All the properties at issue were not titled in the name of HPC Management LLC. Despite Gies' implication that a significant piece of evidence was kept hidden from him until Wood's case in chief, the management agreement is not new evidence, Gies could have discovered it by exercising due diligence, it is cumulative, it was not material, and even if it was, the outcome of the trial would be the same.

### C.  The Jury's Finding of Mail Fraud is Supported by the Evidence

Gies knew the effect of the Baxter satisfaction when he witnessed it, and knew or should have known that the document would be mailed across state lines. The verdict was not against the great weight of the evidence because juries are free to use reasoning and common sense to make deductions and reach conclusions based on both direct and circumstantial evidence. *See* Jury Instruction 5. More precisely, a jury may use circumstantial evidence to establish that a document was actually mailed to a destination in the ordinary course of business. *United States v. Metallo*, 908 F.2d 795, 798 (11th Cir. 1990); *United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir. 2007) (upholding mail fraud conviction where an invoice in evidence indicated an item was requested to be sent to an address despite the resident denying receipt). Gies need only know that the document is of the type that would normally be sent via mail, he does not have to know it was actually mailed or place it in the mail himself. *See* Jury Instructions, ECF No. 600, 14 and 19; *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011); *United States v. Martino*, 648 F.2d 367, 400-05 (5th Cir. 1981) (upholding mail fraud conviction where

defendant was in insurance business and could not have been unaware the mails would be used in processing insurance claims; and approving jury inference that mail was sent from a particular city absent explicit testimony).

Gies was involved in internal discussions about the closing of the Baxter mortgage. *See* Exhibit 160.[5] He admits "having signed the Baxter satisfaction in March of 2012, as one of the witnesses and had all intentions to create accounting entries accordingly... However, Wood instructed Gies later to change the entries despite Gies' concerns." *See* Exhibit 322, Answer, at ¶¶ 171-81. Gies also received a wire of $25,000.00 from the mortgage proceeds to his personal bank account, and withdrew $45,647 from the proceeds on the same day they were wired into a Whydah bank account. *See* Exhibit 511. It is not an insupportable inference, based on Gies' own admission and the general scope of knowledge he had about the various mortgage payoffs and sales discussed during trial, that Gies knew the Baxter property interest was a mortgage in New York and that he created at least one false accounting entry relating to that mortgage. The satisfaction has a notary block specific to New York followed by a fill-in-the-blank notary block for other jurisdictions. *See* Exhibit 159. Gies also participated in the drafting of status reports to HPC, many of which contained information about the Baxter mortgage, including the location of the property and the amount of the loan outstanding. *See* Exhibits 83 and 360. Gies, who worked at the office for over three years and had knowledge of the sales of other properties, would have known that transactional documents would be mailed to the place the property is located for recording. It is reasonable for the jury to deduce that the Baxter satisfaction was mailed outside the State of Florida and that Gies had the requisite knowledge and intent for mail fraud. Just

---

[5] Gunter Gies is copied on this email chain about amounts to be taken off an upcoming closing. The amounts for payoffs in this email on March 29, 2012 are very close to the amounts on the Baxter escrow disbursement letter dated March 30, 2012. *See* Exhibit 163. The satisfaction is dated March 28, 2012 and there are no other closings in evidence between March 8, 2012 (Deerka) and May 2012 (Schwantes 1 and Trailgate). *See* Exhibits 159 and 501.

because a witness to a document is not required to read the document, does not mean that Gies did not witness the satisfaction of mortgage with knowledge of the circumstances, especially in light of the weight of the evidence indicating that Gies had the requisite knowledge and involvement for mail fraud.

### D.  The Weight of the Evidence Bolsters the Jury's Wire Fraud Findings

HPC introduced sufficient evidence at trial supporting the 26 predicate acts of wire fraud underlying the RICO claims. Gies need not be the one to send the status reports via email for the jury to find wire fraud. *See* Jury Instructions 13 and 18. Gies does not even have to take the proceeds of the fraud, he need only "participate[] in a scheme or artifice to defraud and use[] or cause[] the use of the wires for the purpose of executing the scheme." *United States v. Merrill*, 685 F.3d 1002, 1015-16 (11th Cir. 2012). "[G]uilty knowledge may be inferred" even in the absence of presenting "direct evidence of [Gies'] knowledge or state of mind." *See United States v. Tognia*, 579 F. App'x 935, 939 (11th Cir. 2014); *see also United States v. Manning*, 2016 WL 425157, at *2 (11th Cir. Feb. 4, 2016) (quoting *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009)) (circumstantial evidence is sufficient to "supply proof of knowledge of the scheme").

Gies assisted in preparing the status reports underlying the 26 predicate acts. *See* Exhibit 360 (Status Reports Composite). Mr. Pirgmann testified that Gies provided financial information and statements to HPC, and either directly or indirectly to its accountants and auditors, and also that Gies was responsible for the financial information that was included in the status reports. *See* Exhibit H, Pirgmann Testimony, 2/9/16, at 22:5-7; 27:19-24; 28:8-29:21, and Exhibit F, 2/10/16, at 52:24-56:15; 61:17-63:18. That testimony is bolstered by Gies' own admissions. *See* Exhibit 322 (Answer). While Gies denies being the one to prepare false reports and self-servingly lays

that action at Wood's door, he simultaneously admits that he changed accounting entries to conceal transfers. *Id.* The jury was also free to draw conclusions from Gies sending a draft of a status report to Wood, at a time that Gies knew that the Myra Jordan property had been sold, and stating that he would "leave" the changes to the status report for that property to Wood. *See* Exhibit 83. That email, among other evidence, is sufficient for the jury to infer that Gies knew that false reports were being sent to HPC and participated in the creation of those reports.

### E.  Like Mail and Wire Fraud, Florida RICO is Supported by the Evidence

Gies challenges the verdict on the Florida RICO claims by reciting his previous complaints about the mail and wire fraud findings. For the reasons discussed herein, the verdict is not against the great weight of the evidence for Florida RICO.

## II.    Renewed Motion for Judgment as a Matter of Law

### A.  Standard

A movant under Federal Rule of Civil Procedure 50 only prevails if "considering the evidence in the light most favorable to the non-moving party, the evidence so strongly points in favor of [the movant] that reasonable men could not reach a contrary verdict." *Iervolino v. Delta Air Lines, Inc.*, 796 F.2d 1408, 1418 (11th Cir. 1986). The Court "may not make credibility determinations or weigh the evidence;" thus, credence is given to "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). "[T]he Court's role is limited to deciding whether there is *some* evidence in support of the verdict such that a reasonable person

could have supported it." *Peeler v. KVH Indus., Inc.*, 13 F. Supp. 3d 1241, 1246 (M.D. Fla. 2014).  In addition, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *Id.* (citing *Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 903 (11th Cir.2004)); *see also Peeler*, 13 F. Supp. 3d at 1247-48 (M.D. Fla. 2014) (quoting same).[6]

B.  Gies Has Not Met the Burden for Judgment as a Matter of Law on the Fraud Claim

Gies claims that the evidence cannot support the Fraud claim because it does not show that Gies improperly received any money, citing Exhibit 390, a promissory note executed by Wood. Gies further states, without citing any exhibits or testimony, that he made monetary advances and was not recompensed for those loans/advances. Even if Gies' claims were supported by evidence, a reasonable jury could still find Gies liable. Damages for violations of RICO and for fraud are based on the harm to HPC as a result of Gies' actions, not a disgorgement of whatever personal benefit Gies received. *See* Jury Instructions, ECF No. 600, Nos. 11, 12, 16, 17, 25, 26, and 28.   The elements of mail and wire fraud require only that Gies participate in a scheme to defraud or to obtain money or property from HPC – personal profit is not a necessary element and intent to defraud is demonstrated either by deceiving someone for personal financial gain *or causing financial loss to someone else*. *Id.* at Nos. 13 and 14; 18 and 19. It is irrelevant whether or not the funds received by Gies were repayment of loans to HPC/Wood or not. Acting in order to secure the priority repayment of funds and continued compensation as the bookkeeper, with knowledge that property transactions were being concealed from HPC, is enough for a reasonable jury to find liability. Even if Gies' return of

---

[6] Attached as Exhibit I is the transcript of Gies' Rule 50 motions during trial.

monies lent was a net negative, his participation in the conduct of an enterprise and in a fraud supports submission of this case to the jury.

Turning to the factual merits of Gies' claims, the lynchpin of his argument, Exhibit 390, is itself problematic to his position that all transfers were loan repayments. The face of the note, executed by Wood, claims it pertained to a debt from HPC, but also from The Whydah Group, Inc. Sufficient evidence was introduced at trial that the Whydah Group, Inc. was Dale Wood's personal company and should not have received monies relating to HPC. *See* Exhibit 427-35, 495, and 503; and Pirgmann Testimony, 2/9/16, at 40:20-42:5; 54:5-11, and 2/10/16, at 83:23-84:17.  The note also states that in exchange for $150,000.00 Gies would receive $175,000.00 roughly four months later. *See* Exhibit 390. This represents a return on investment of 16.6% in only 126 days – a return that any reasonable jury would be justified in finding suspect. Even assuming Gies gave the $150,000.00 to HPC, which was not proved by any competent evidence at trial, Gies received at least $315,179.40 via checks written in his name, transfers to his personal bank account, or according to attorney disbursement records, and all stemming from the property transactions concealed from HPC discussed at trial. *See* Exhibits 211 (Arbor Vitae), 505 (Lapahana), 506 (Greensboro), 508 (Trailgate), 509 (Westridge), 510 (Hilcrest), 511 (Baxter), 513 (De Los Reyes). Of those funds, roughly $220,143.92 were paid to Gies prior to the date of Exhibit 390. *See* Exhibits 211 (Arbor Vitae), 506 (Greensboro), 508 (Trailgate), 509 (Westridge), 511 (Baxter), 513 (De Los Reyes). These numbers, while high, are merely a baseline: transfers to Gies' bank account identifiable in the bank records introduced into evidence as Exhibits 465 and 489 that could not be traced to a particular property transaction are not included,[7] and neither are the sums withdrawn in cash or other untraceable means by Gies

---

[7] For example, the prior calculations did not include the $69,100.00 (two wires: $15,000.00 and $54,100.00) that Gies received in March 2013 from the same Whydah bank account where the $500,000.00 that Wood took from

from the known properties. It also appears from at least one email that when Gies requested "repayment" he included an often unspecified "premium." *See* Exhibit 334.[8] Interestingly, this email does not reference the amount on the promissory note executed during the same time frame. *See* Exhibits 334 and 390. Based upon the rate of return in Gies' promissory note (Exhibit 390), it is reasonable to discern that any "premium" Gies received was substantial relative to the amounts allegedly lent. Moreover, Gies identified no financial proof at trial supporting the claim that any funds were actually lent and if so, whether those funds were for HPC rather than a another purpose related to Mr. Wood's other "businesses." Considered among the totality of the evidence presented at trial, the previously discussed exhibits and related inferences establish a more than sufficient basis for a reasonable jury to find for HPC, regardless of Gies' reliance on Exhibit 390.

Gies further asserts that not one document has been offered into evidence showing fraudulent intent on the part of Gies. There is more than enough evidence for a reasonable juror to find fraudulent intent. As an example, Gies actively assisted in concealing the removal of property interests from the HPC portfolio and the distribution of the related proceeds, and, more generally, knowingly abetted Wood in keeping Mr. Pirgmann from learning about the true financial status of both Blackport and HPC. *See generally* Exhibits 22, 83, 84, 136, 137, 192, 322

---

Michael Pirgmann was deposited in the same month. *See* Exhibit 467, at p. 1382-84 (total deposits for month: $582,806.87; beginning balance: negative $10,006.56; ending balance: $37.27), and Transcript of Michael Pirgmann, 2/9/16, at 43:9-22.

[8] This email appears to claim that roughly $43,500 was owed to Gies in 2013 and that $115,000.00 was owed (and repaid) in 2012, for a total of $158,500.00. Yet, from funds traceable to HPC's property interests, Gies received at least $315,179.40 – a difference of $156,679.40. Gies may claim that this differential was his pay, but a reasonable jury is free to draw inferences from the fact that many payments were for even denominations in excess of $5,000.00, that these calculations do not account for all payments to Gies, and that $156,679.40 would equate to $78,339.70 per year for a part time bookkeeper. All of these calculations were available to the jury from the exhibits in evidence.

(Answer[9]), 346, 349, and 399. Gies plotted with George Kalogeropoulos, another person in the office, to get his money back from the closing of the Alaska property and remarked "last exit before exitus." *See* Exhibit 22. Gies' conduct with respect to the status report being prepared after the sale of the Myra Jordan property indicates he had knowledge the property had sold and would not be reflected accurately in the status report. *See* Exhibit 83 and 84. Gies was actively involved in making the $1.1 million from the Jaramillo mortgage payoff disappear in the bookkeeping for HPC, and hoped those bookings would pass inspection by HPC's outside accountant (Roedl) and auditor (GT). *See* Exhibit 136 and 137, and Pirgmann Testimony, 2/10/16, at 28:10-14. Gies also made suggestions on liquidating assets such as forcing a borrower into a deed in lieu of foreclosure and "blow[ing] the damned shack out at a dumping price." *See* Exhibit 192, and Pirgmann Testimony, 2/10/16, at 74:2-9. Gies on multiple occasions referenced a hope that Mr. Pirgmann, HPC's representative, would not learn something, and made a conscious effort to keep Mr. Pirgmann from learning about unpaid taxes, etc. *See* Exhibits 346, 349, 399. Moreover, there is sufficient evidence in the record supporting a finding that Gies undertook a duty to render truthful reports to HPC and create accurate financial records. Mr. Pirgmann testified about Gies' role as the bookkeeper, and his interactions with HPC, its accountants, and its auditors in connection with that role. *See* Pirgmann Testimony, 2/9/16, at 22:5-7; 26:20-29:21. Gies was also involved in HPC's auditing process, yet did not reveal that properties covered by the audit had sold and that the proceeds were not reflected in the books he

---

[9] Gies admits in his Answer that he knew about the following property sales or mortgage repayments, but changed the accounting entries at Wood's instruction and despite Gies' concerns:  Trailgate, Myra Jordan, Jaramillo, Baxter, Arbor Vitae, Schwantes. *See* Exhibit 322, at ¶ 95, 115, 162-64, 171-81, 235-56. A clear inference from these admissions is that Gies knew inaccurate reports were being relayed to HPC, their accountants, and their auditors based on Gies' books. The jury is free to discredit Gies' own contrary statement that he prepared reports with accurate representations and was unaware of false statements going to HPC. *Id.* at ¶ 384.

prepared. *See* Exhibit 400[10] and Pirgmann Testimony, 2/9/16, at 22:5-7, 27:15-24. Gies had

plenty of opportunities to tell Mr. Pirgmann that properties had sold and thus the reports and

financials being provided to HPC were false, but Gies never admitted anything until Mr.

Pirgmann confronted him in August 2013. *See* Pirgmann Testimony, 2/9/16, at 44:9-45:7; 80:24-

81:13. The evidence indicating Gies' knowing involvement in providing false statements to HPC

is more than sufficient to avoid a judgment as a matter of law on the fraud-based claims.

      C.  The Evidence of Mail Fraud is Enough to Evade Judgment as a Matter of Law

      The RICO statutes require the commission of two predicate acts: HPC asserted one act of

mail fraud and 26 acts of wire fraud. As to mail fraud, Gies witnessed, for three separate

signatures by Wood, a satisfaction of mortgage that was recorded in the official records in New

York. *See* Exhibit 159. Looking at the satisfaction, it is apparent that the document was notarized

in Fort Lauderdale, Florida and recorded in the New York official records after being presented

for recording by a title agent with an office on Staten Island. There are only so many ways for an

original document, executed on March 28, 2012, to find its way to be recorded in the official

records of New York on April 16, 2012, the most logical of which would be via interstate mail

carrier from Florida to the title company in New York. The fact that the mails were used can be

gleaned from circumstantial evidence, direct evidence is not required. *United States v. Metallo*,

908 F.2d 795, 798 (11th Cir. 1990); *United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir.

2007) (upholding mail fraud conviction where an invoice in evidence indicated an item was

requested to be sent to an address despite the resident denying receipt). Gies does not have to be

the one to deposit the document in the mail, rather he only had to know that the use of the mail or

interstate carrier would usually follow in the ordinary course of business or where the use of the

---

[10] Gies endeavored to answer a question apparently raised by the auditor and then commented "maybe there will be no next year" when the auditor expressed frustration.

mails can be reasonably foreseen. *See* Jury Instructions 14 and 19. Gies himself need not actually intend for the document to have been mailed, it's the intent to defraud that is necessary. *Bradley*, 644 F.3d at 1239; *Martino*, 648 F.2d at 400-05. The mailing itself need not be malicious or contain false information. *See* Jury Instructions 14 and 19. A jury may infer an intent to defraud from Gies' conduct. *Bradley*, 644 F.3d at 1239. "Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud." *Id.*

Gies admits that he witnessed the Baxter satisfaction. *See* Exhibit 322, Answer. Gies assisted in the preparation of status reports for HPC. *See* Exhibit 83 and Pirgmann Testimony, 2/9/16, at 17:24-22:7, and 2/10/16, at 55:15-56:15. Many of those status reports contained information about the Baxter mortgage, including that it was in New York and the amount of the loan outstanding. *See* Exhibit 360. As previously discussed, Gies was also involved in internal discussions about the closing on the Baxter mortgage. *See* Exhibit 160. Gies was also paid at least $25,000.00 from the Baxter payoff. *See* Exhibit 511. It is not a far leap that Gies, who worked for roughly four years in a real estate management office during a period of time when roughly 19 property interests were conveyed or satisfied, would have realized that an original document affecting real property would be sent via the mails to be recorded in the place where the property was located. Sufficient evidence was presented at trial to defeat Gies' Rule 50 motion.

D.  The Evidence at Trial Establishes a Jury Question as to Federal RICO

Gies claims it was shown at trial that he did not perform any acts that amount to fraud, and that nothing was offered to prove he agreed to take affirmative acts towards defrauding HPC, or that an enterprise exists.  For the reasons already discussed previously, substantial evidence that Gies committed fraud was put before the jury: judgment as a matter of law is inappropriate.

Page **15** of 21

According to Gies, "[t]he uncontroverted evidence adduced at trial is that Wood provided all information and direction to Defendant Gies." Gies may be claiming he was acting within the scope of his employment and thus should not be liable. Even if Wood, Gies' supervisor, is the one who told Gies what to do, Gies is still liable for violating RICO. Whether a RICO defendant is acting within the scope of employment is usually only a factor where the vicarious liability of an entity defendant is at issue. Nevertheless, Gies' actions were well beyond the scope of his job duties:  Gies was not hired in order to engage in racketeering violations. *See Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 777 (9th Cir. 2002) (noting that conspiracy is outside the scope). A bookkeeper's job duties naturally include accurate reporting of financial information, and the testimony at trial demonstrates that such accuracy with respect to HPC's property interests was expected from Gies. *See* Pirgmann Testimony, 2/9/16, at 26:20-28:13, and 2/10/16, at 93:14-20. The evidence at trial indicates that Gies was well aware HPC relied on him as a bookkeeper to render accurate reports to HPC, their auditors, and accountants. Nonetheless, there is no precedent for refusing to find an agent liable for RICO where the agent willingly participates in conduct that he knows to be wrongful, such as fraud, and does so without the knowledge of the principal-plaintiff. Section 1962(c) is specifically drafted to apply to employees or agents. Under section 1962(c) it is unlawful for "any person **employed by or associated with** any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" (emphasis added).

HPC also introduced sufficient evidence of an enterprise among Gies, Wood, Whydah, Wellesley, and Burgess. An enterprise is an association, which may be loose or informal, that has a purpose, relationships among those associated with it, and a duration sufficient to permit those

associates to pursue that purpose. *See* Jury Instructions 11 and 16. Gies worked part-time as a bookkeeper under the direction of Wood. *See* Pirgmann Testimony, 2/9/16, at 26:20-25. He kept the books for Wellesley and was an officer, along with Wood and Burgess, in 2012. *See* Exhibits 350 and 491. Gies kept the books for Whydah, Wood's entity, while it was engaging in "business" unrelated to HPC, including the execution of promissory notes with excessive interest rates. Pirgmann Testimony, 2/10/16, at 84:6-8, and 2/9/16, at 46:14-23. At least one purpose of the enterprise, gleaned from the evidence, was to obtain HPC's money and property at the detriment of HPC. Wellesley obtained title to two properties, Alaska (April 2013) and Ruston (July 2013); advertised Atlantic City, Greensboro, and Jaramillo on its website; and attempted to buy HPC Capital, the German entity. *See* Exhibits 3, 42, 64, 66, 134, 251, 327, and 328; and Pirgmann Testimony, 2/10/16, at 123:16-124:16. HPC was not informed that Wellesley was "acquiring" its property interests, such as Alaska and Ruston. *See* Pirgmann Testimony, 2/10/16, at 32:24-36:20. Wellesley was also connected to The Pan American Fund, LLC as its manager-member from April 2012 to August 1, 2013. *See* Exhibit 490. During that time frame, The Pan American Fund, LLC sold the Arbor Vitae property and Wood directed the proceeds into a Whydah account. *See* Exhibit 211. Also at that time, funds stemming from the following HPC properties entered The Pan American Fund, LLC's bank account: Myra Jordan and Westridge. *See* Exhibits 507 and 509. Whydah, or its d/b/a "Blackport Property," received monies from the following HPC properties into accounts on which Gies was a signatory: Jaramillo, Myra Jordan, Baxter, Trailgate, Atlantic City (De Los Reyes Properties), Lapahana, Hilcrest. *See* Exhibits 465 (B, p. 15) and 467 (p. 285).505, 507, 508, 510, 511, 512, and 513.  Lastly, some of the funds from Myra Jordan and De Los Reyes Properties (Atlantic City) went to a Wellesley account. *See* Exhibit 507. The evidence supports an enterprise lasting from at least 2010, when Gies was

added to the Whydah bank account and when Wellesley was formed, to 2013, when Wellesley acquired the Alaska and Ruston properties, and Pirgmann confronted Gies. *See* Exhibits 467 (p. 285) and 491, and Pirgmann Testimony, 2/10/16, at 52:2-53:15; 112:4-10. During that same time frame, Wood and Gies were preparing status and financial reports that were sent to HPC and contained false statements: HPC's interest in the Deerka mortgage was fully paid off to Pan American by October 27, 2010. *See* Exhibits 174, 501 and 502 (p. 2), and Pirgmann Testimony, 2/9/16, at 85:6-86:6.

The evidence supporting Gies' involvement in the fraud and the existence of an enterprise under Federal RICO is not so strongly pointed in favor of Gies that a reasonable jury could only find for the defendant. But, even if there was insufficient evidence for the main RICO claims, the conspiracy claims would survive. Evidence that Gies assisted in concealing a conspiracy supports the inference that Gies joined in the conspiracy while it was under operation, and circumstantial evidence generally is enough to prove agreement to the objective of the conspiracy. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1411 (11th Cir. 1994); Jury Instruction 12. Gies has admitted that he knew property interests had been sold or satisfied and that those transactions were not being reflected accurately in financial documents he prepared. *See* Exhibit 322, Answer. Gies sent several emails designed to conceal material facts from HPC's representative, Mr. Pirgmann, and also assisted in preparing false status and financial reports. *See* Exhibits 83, 333, 346, 349, 399, and Pirgmann Testimony, 2/9/16, at 22:5-7, and 2/10/16, at 41:10-43:25; 51:20-53:15; 61:8-63:18; 66:11-70:22; 76:3-10; 77:3-80:10.

E.  Judgment as a Matter of Law on Florida RICO is Not Merited

Like with Federal RICO, Gies argues, without a single legal citation, that "following an employer's instructions does not amount to having proven intent" and appears to claim this

establishes a lack of enterprise or conspiracy. Even if following an employer's instructions was a defense to liability, participating in a conspiracy or RICO enterprise is beyond the reasonable scope of any employment Gies could argue he was engaged in. Assisting another with converting the proceeds of conveyances of HPC property interests for personal or other illegitimate uses also exceeds the scope of Gies' employment. Gies has not met his burden for judgment as a matter of law given the evidence introduced by HPC.

WHEREFORE, HPC respectfully requests that this Court allow judgment to be entered on the verdict and deny Gies' motion for judgment as a matter of law under Rule 50 or in the alternative for new trial under Rule 59.

Dated this 21st day of March, 2016.

Respectfully submitted,

TRIPP SCOTT, P.A.
Attorneys for Plaintiffs
110 SE 6th Street, 15th Floor
Fort Lauderdale, Florida  33301
Tel. 954-525-7500
Fax. 954-761-8475

By:  __/s/ *Megan L. Janes*_____
Paul O. Lopez
Fla. Bar No. 983314
pol@trippscott.com
Richard L. Petrovich
Fla. Bar No.  567248
rlp@trippscott.com
Megan L. Janes
Fla. Bar No. 0099009
mlj@trippscott.com

1269742v3 993940.0001

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this **21st day of March, 2016**, I certify that the foregoing document is being served this day on all parties and counsel of record identified on the below Service List in the manner specified, either via electronic mail or in some other authorized manner for those parties who are not able to receive documents via electronic service.

TRIPP SCOTT, P.A.
Attorneys for Plaintiffs
110 SE 6th Street, 15th Floor
Fort Lauderdale, Florida  33301
Tel. 954-525-7500
Fax. 954-761-8475


By:  */s/ **Megan L. Janes**_____*
Megan L. Janes
Fla. Bar No. 0099009
mlj@trippscott.com

<u>**SERVICE LIST**</u>

**Via Notices of Electronic Filing:**

**Joseph Peter Klock , Jr.**
**Juan Carlos Anotorcha**
**Miguel A. Morel**
Rasco, Klock, Perez, & Nieto, P.L.
*Counsel of record for Gabreila Rodino as legal representative for Defendants Gabriel De Los*
*Reyes, De Los Reyes Properties, LLC; Gabriel De Los Reyes; Atlantic City Properties, LLC;*
*Tribeca 56 Walker, LLC; Rite Timing Services Corp., (Collectively "De Los Reyes Groups")*
2555 Ponce de Leon Blvd, STE 600
Coral Gables, FL 33134
305 476-7105
Fax: 305 675-7707
Email: jklock@rascoklock.com
Email: jantorcha@rascoklock.com
Email: mmorel@rascoklock.com

**Elliot J. Lupkin, Esq.**
*Counsel for Gunther Gies*
1East Broward Boulevard, Suite 700
Ft. Lauderdale, FL  33301
954-767-9200
Fax:  954-522-2718
Email:  eliotlupkinpa@aol.com

**Via Email to:**

**The Whydah Group, Inc.** at the last known email address of Dale Wood, its former president
and registered agent, dalewood@bellsouth.net.

**The Pan American Fund, LLC**, at the last known e-mail address of Dale Wood, its former
registered agent and manager, dalewood@bellsouth.net.

**Dale Wood,** dalewood@bellsouth.net